Filed 1/5/16  P. v. Reading CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>AARON LAFOY READING,<br><br>    Defendant and Appellant. | F068602<br><br>(Kings Super. Ct. No. 13CM7432)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Donna Tarter, Judge.

James F. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Aaron Lafoy Reading was convicted of kidnapping, burglary, and attempted criminal threats, based on a series of domestic disturbances with his former

girlfriend, Arlene M. (Arlene) and their infant child. Defendant had repeatedly threatened to take the child and sell her in San Francisco. On the morning of August 2, 2013, defendant entered the Corcoran residence where Arlene and the baby were living, grabbed the child from her crib, and drove away with her. He was stopped by the California Highway Patrol while driving northbound on Highway 99, approximately 60 miles away.

On appeal, defendant argues there is insufficient evidence of kidnapping because he had the legal right to take his daughter for visitation. He also contends the court should have given the defense pinpoint instruction on that issue. Defendant challenges the sufficiency of the evidence for the burglary and attempted criminal threats convictions. We affirm.

## FACTS

Arlene was living in New York when she met defendant on the Internet. In February 2012, Arlene moved to San Francisco and started living with defendant.

In March 2012, defendant and Arlene moved to Corcoran. Arlene was pregnant with their child. Defendant and Arlene lived together in a fifth-wheel trailer parked next to the house of defendant's father, Ronald Reading (Ronald).

In November 2012, Arlene gave birth to their daughter, E. In December 2012, Arlene and the baby moved from the trailer into Ronald's house. Defendant slept in the trailer, but defendant and Arlene were still together as a couple.

### Defendant's initial threats about their child

Arlene testified that throughout her relationship with defendant, he said he was going to send Arlene back to New York and sell her child. Defendant began making the threats about selling the child from the beginning of Arlene's pregnancy, in approximately March 2012. Defendant made these statements "[w]eekly at the very least."

2.

Arlene testified she was terrified about these threats. Defendant continued to make the threats after E. was born, and said he would take the child and sell her in San Francisco: "[H]e just said that she was cute and he could make a lot of money off of her, and he was going to sell her."

Arlene testified about an incident that occurred in December 2012, when Arlene and the baby were living at Ronald's house, and defendant was sleeping in the trailer. Arlene went to the trailer to visit him. Defendant was drunk and wanted to have sex, but Arlene refused. As she left the trailer, defendant slapped her in the back of her head.

Arlene testified she never called the police about anything that happened while they were living at Ronald's house.

**Arlene moves to Tulare**

On or about July 1, 2013, Arlene and her child left Ronald's house. They moved to a trailer park in Tulare and lived with defendant's brother, Christopher Gallagher. Defendant also stayed at the trailer.

Arlene testified that when they moved out of Ronald's house, defendant "was told" to give back all the keys to his father. She assumed that he did.

Arlene testified about an incident that occurred early in July 2013. She was at the trailer with defendant and his brother. Defendant picked up E. from the floor by her shirt. He took the child into another room and "barricaded the door shut." Arlene tried to open the door to get her child. Defendant's brother managed to open the door, and Arlene took the child. Defendant slapped Arlene in the face with an open hand.

Arlene testified they were served with an eviction notice from the trailer in Tulare. Defendant packed up his things, said he was driving to San Francisco, and left. An hour later, he returned to the trailer. "And he camped out on my front porch and walked around the house in circles banging on the doors and windows, and [I] called the cops

3.

about four times." Defendant sent a text message to Arlene saying that he could break into the trailer, and "there was nothing [she] could do about it."

Arlene testified about another incident that occurred in July 2013, as she was in the process of moving from the trailer in Tulare back to Ronald's house in Corcoran. Defendant again said he was going to sell E. He also said the child would be better off in foster care.

Arlene testified the police were called to the Tulare trailer numerous times to deal with her conflicts with defendant. She told the officers about defendant's threats to take her child. The officers said "they couldn't do anything about it, it was a civil matter" because E. was defendant's child.

**Arlene moves back to Corcoran**

As of July 11, 2013, Arlene and her child moved back to Ronald's house in Corcoran. Arlene returned there because her own family was in New York, and she had nowhere else to go. Arlene testified defendant did not move back to Ronald's house with her. Arlene believed defendant stayed at his brother's trailer in Tulare.

Ronald testified that he and his wife decided to allow only Arlene and the baby to move back to their house. They did not allow defendant to live there. Arlene believed defendant was not welcome at his parents' house.

**The first restraining order**

Arlene testified that after she moved back to Corcoran, defendant repeatedly called and sent her text messages. In the period between July 17 and 18, 2013, he sent her 66 text messages and called 59 times. She did not respond.

On or about July 18, 2013, Arlene printed out the numerous text messages, went to the police department, and filed for a restraining order because of defendant's conduct. A temporary restraining order was issued to keep defendant away from Arlene and E.

On July 18, 2013, Corcoran Police Officer Evette Galutara spoke with Arlene at the police department. Arlene told Galutara that she received about 43 calls and 16

4.

messages in the previous 24 hours from defendant. Galutara testified Arlene did not show her the messages. Arlene "appeared to be a little worried about her daughter, and about her daughter's father coming to town." Arlene said she filed the paperwork for a restraining order that day.

Officer Galutara told Arlene that she had to serve defendant with the restraining order to keep him away from his own child.

> "I told her that it needed to go through the courts and be processed, and then we needed a paper verifying that in order to keep him away, or anything dealing with a restraining order and child custody."

While a temporary restraining order (TRO) was issued to keep defendant away from Arlene and E., it was never served on defendant. Arlene knew it was never served on him.

**Defendant's Facebook posts to friends**

In July and August 2013, defendant posted numerous statements on his Facebook page about his relationship with Arlene[1]

On July 12, 2013, defendant posted to his friend, Kelsey: "Waiting for Ally [Arlene] to come outside to talk." Kelsey asked why, and defendant said he was bored and it was for fun. Defendant also wrote: " 'Hiding in the shadows' " and " 'sitting here in the car … [o]n the side street.' " Defendant later posted that he " 'came back home,' " and that " 'Ally [Arlene] was scared.' " Kelsey asked what she was scared about, and defendant replied: " 'Me.' "

On July 20, 2013, defendant had an exchange with another friend, Kerianne, and asked: " 'Is it legal to take my child and disappear with her?' " Kerianne replied he had equal rights to her if there wasn't a custody agreement.

---

[1] During the pretrial investigation, the district attorney's office served a search warrant for defendant's Facebook account, and received a CD which contained thousands of his posts.

5.

On July 30, 2013, defendant exchanged messages with Kerianne about Arlene's temporary restraining order. Defendant said he knew about the order, even though it was not served on him. He wrote: " 'Girlzilla filed a protective order to keep me from seeing my child but she can't serve me.' " Kerianne asked if Arlene knew where he was. Defendant replied no, and wrote that it " 'forces me to stay away from my dad's house where she is staying, but I technically live there, so how does that work.' " Defendant also wrote: " 'My mail and DMV stuff goes there, so I can say *Im* a resident there, too. Judge will throw it out I bet also *cuz* there is no merit for a PO.' " (Italicized portions denote spelling and grammatical errors in the original.) Defendant continued: "*Its* no good *til* a *sherrif* serves me I was told" and "I need to find out when the hearing is so I can show up and win the case." (Italicized portions denote spelling and grammatical errors in the original.)

Also on July 30, 2013, defendant sent text messages on his cell phone to various friends, which included the statement that something was going to happen: "Nothing illegal. Just hateful."[2]

On July 31, 2013, defendant had a Facebook exchange with Chris Gallagher and Andrew Reading about his relationship with Arlene, and he made the following statements: "She will be a career welfare mother. She provides nothing for the child and never will, to be continued," and "Theres [*sic*] a surprise on the horizon." Gallagher asked what, and defendant said "I'll let you know later." Andrew Reading asked, "*Whats* going on?" to which defendant replied: "Something huge is *gunna* happen in a few days," "I am *gunna* be on the news," and "Just wait and see." (Italicized portions denote spelling and grammatical errors in the original.) Andrew Reading asked what it was all

_____

[2] When defendant was arrested, the police seized his cell phone and took photographs of his messages.

6.

about. Defendant posted a series of replies: "Channel 26 Primetime," "6:00 news," "Yeah. It is gunna [*sic*] be craziness," and "News chopper 26."

**Defendant's messages to Arlene**

After obtaining the restraining order, Arlene changed her telephone number twice so defendant could not contact her. However, defendant started sending messages to Arlene on her Facebook page. Arlene had a private account and defendant was not a "friend," but he could still send messages to her.

On July 31 and August 1, 2013, Arlene received several messages on her Facebook page from defendant. The messages said: "[D]on't make visitation day akward [*sic*]. It's coming very soon. If we keep letting things boil over, things may go very wrong during visitation. Think about it."[3] He also wrote: "[O]k so were escalating this. Ok im [*sic*] all in. war time. Your TRO is DOA. Its [*sic*] trash cuz [*sic*] you have to have it served to go into effect[]" and "Im [*sic*] gunna [*sic*] shake the world in a few days." "I'm living it up here. Kickback and so relaxing. Having a blast. *I really don't care about the child*." (Italics added.)

Arlene testified she was terrified defendant was going to take E. and sell her in San Francisco, as he previously threatened to do. She feared "[i]t could be sex trade, it could be drugs, it could be anything. I would never see her again."

On August 1, 2013, defendant posted a copy of a Twitter post from Arlene on his Facebook page. In her Twitter post, Arlene wrote she was lonely and missed defendant. Defendant then engaged in an exchange with Kerianne about Arlene's post, and he wrote: "The calm before the storm," and "Her TRO is null and void."

---

[3] There is no evidence that defendant and Arlene had agreed on a visitation schedule, that defendant was scheduled to visit the child, or there was any type of court-ordered visitation.

**Arlene's second report to the police**

On August 1, 2013, Officer Galutara called Arlene and asked if she had any other issues. Arlene said she was having more problems because defendant was sending messages to her. Arlene again went to the police department and gave defendant's messages to Galutara. Galutara testified Arlene was "pretty upset, she was crying. She kept telling me she was scared and worried" that defendant was going to "drive into Corcoran because apparently he didn't live there." Arlene testified she told the officer that she was afraid defendant was going to steal her baby.

**The burglary and kidnapping**

Around 5:30 a.m. on August 2, 2013, Arlene and her child were living at the home of defendant's father in Corcoran. E. slept in the same bedroom as Arlene Arlene and the child were asleep. Defendant's parents were at work, and no one else was home.

Defendant entered his parents' house. Arlene did not wake up when defendant entered the house, but she heard noise from her bedroom door and realized it had been opened.

Arlene woke up and discovered defendant was in her bedroom, and he was "stealing my daughter out of her crib." Defendant grabbed E. and the child screamed. Arlene testified defendant ran away, and held E. with his arms extended in front of him. Arlene screamed "no" and ran after defendant. He ran to his car, which was parked in front of the neighbor's house. Arlene ran a couple of "arms lengths" behind him. As Arlene ran after defendant, she tripped and fell in the front yard and injured her leg. Arlene watched defendant get into his car with E., who continued to scream. He placed E. on his lap and drove away.[4]

---

[4] According to the probation report, defendant told the probation officer that the entire incident was a misunderstanding, that he believed he had the right to pick up his daughter from his father's house, and he was going to spend the afternoon with her.

Arlene was distraught. She went back into the house and immediately called 911. She did not see any signs of a forced entry into the house.

**The police response**

Officer Benjamin Beavers responded to Ronald's house on a dispatch about a family dispute. When he arrived, the front screen door was closed but the interior door was open. Arlene was inside and he spoke to her through the screen door. Arlene "seemed very distraught, she was crying, she was yelling for help." Arlene said: "I can't open the door, please help me. He took my daughter. He took the doorknob off the door, and I can't get out." Arlene told Beavers the screen door's handle was on the ground.

Officer Beavers found the handle and knob for the screen door on the ground. He picked them up, replaced them in the slot, and opened the door for Arlene[5]

Arlene told Officer Beavers that defendant took E. while the baby was asleep in her crib. Arlene said she was asleep when she heard a popping noise, like her bedroom door being opened. She woke up and looked toward the bedroom door. She said defendant quickly grabbed the child, ran out of the bedroom, and left through the front door. Arlene said she chased him and he left the screen door somewhat ajar, so she was able to get out. Arlene said she could not stop defendant, and he drove away in his car. Arlene said she was able to get back into the house, but became stuck inside because the handle had been removed from the screen door.

**The search for defendant and the baby**

Arlene gave a detailed description of defendant and his car. Officer Beavers confirmed the details about defendant's car and registration, and the Corcoran Police Department broadcast a statewide dispatch about the child abduction.

---

**5** Ronald testified the screen door handle was loose and could easily be pulled off. Ronald testified that "if you let the door slam closed it falls off," and it is hard to open the door.

Detective Alex Chavarria was part of the team that tried to find defendant and the baby. Chavarria received a dispatch that defendant's cell phone company had "pinged" defendant's cell phone and located him in Tulare. Chavarria went to a particular location but he did not see defendant or his car. Chavarria then received information that defendant was possibly heading to San Francisco, and his cell phone was "pinging" just north of Chavarria's position on Betty Avenue near Highway 99.

Detective Chavarria drove onto northbound Highway 99. He was driving his own unmarked vehicle. When Chavarria was about 60 miles north of Corcoran, he saw defendant's car traveling on northbound Highway 99 near Avenue 7, just north of Fresno.

Detective Chavarria followed defendant in his unmarked vehicle and contacted the California Highway Patrol. Chavarria testified defendant continued to travel on northbound Highway 99, "which is the general direction of San Francisco, which [we] believed he was headed." Defendant did not stop or turn off the highway.

**Arrest of defendant**

Officer James Yates of the California Highway Patrol monitored the broadcasts about defendant's car. Yates joined the pursuit on northbound Highway 99 in Madera. He saw defendant's car and conducted a traffic stop; defendant pulled over.

As Officer Yates approached the vehicle, he saw movement in the backseat and drew his gun. He thought another suspect might be in the car. When he looked inside, he saw E. in the back seat. The child was buckled into a car seat. However, the car seat was not correctly secured to the back seat, and it had shifted forward and sideways. "There was a good ten-inch gap between the back rest and the edge of the car seat." Yates testified the child was not in a safe situation "by any stretch of the imagination." If defendant had been in a crash, the car seat was not secure, and the child was at risk for injury or death.

Officer Yates testified E. was holding a large plastic bag that was about two feet by three feet. It was a heavier type of plastic than a plastic grocery or trash bag. E. "had

10.

a grasp on it and had it pulled over its face when I first approached" the car, and there was an absolute suffocation risk. Yates took the bag away from the baby.

Defendant was arrested at the scene and transported back to Corcoran.

About six hours after the kidnapping, an officer returned E. to Arlene in Corcoran. Arlene obtained another restraining order against defendant because she knew the first order had not been served on him. Arlene was still afraid of defendant, and afraid he would "be able to get out and take my kid." The second order was successfully served on defendant.

**Arlene's testimony about defendant's threats**

At trial, Arlene testified that she continued to live with defendant even though he threatened to sell their child. She did not report the threats to the police because she was afraid defendant would hit her; he would send Arlene "back to New York to nothing"; and he would "do something terrible" to the baby.

"Q.    Was there a reason why you didn't report the threats [defendant] made to you about selling your child?

"A.    I didn't really think that it would happen.

"Q.    And when you—when did you start believing it would happen?

"A.    When—I don't know honestly.

"Q.    Did you believe he would sell your baby?

"A.    I tried really hard not to.

"Q.    But did you?

"A.    When he took her, yes."

Arlene testified that when she went to the police on August 1, 2013, she had "no doubt that he would take" and sell the baby.

"Q.    So the day before [the burglary/kidnaping] when you reported to the police, you did believe that he would take your baby and he would sell your baby?

11.

"A.     Yes."

**Verdict and sentence**

After a jury trial, defendant was convicted as charged of count I, kidnapping of E. (§ 207, subd. (a));[6] and count II, first degree burglary of a building occupied by Arlene and E. (§ 459).

In count III, defendant was charged with making a criminal threat to E., with the specific intent the statement be taken as a threat by Arlene (§ 422). He was found not guilty of this count, but convicted of the lesser included offense of attempted criminal threat (§§ 664/422).

Defendant was found not guilty of count IV, stalking Arlene (§ 646.9); and count V, child endangerment of E. (§ 273a, subd. (a)). Defendant admitted his prior strike conviction.

Defendant was sentenced to the aggregate term of 16 years 8 months.

## DISCUSSION

### I.     Substantial Evidence of Kidnapping

Defendant contends there is insufficient evidence to support his conviction in count I for kidnapping E., in violation of section 207, subdivision (a), because he had the right to custody of his daughter, the restraining order was never served on him, and there is no evidence he took his daughter for an illegal purpose. He further argues the kidnapping charge could not be based on the alleged illegal acts of either stalking or making a criminal threat since the jury found him not guilty of those substantive counts.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is

---

[6] All further statutory references are to the Penal Code unless otherwise stated.

unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " [Citations.]' [Citation.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 792793.)

## A. <u>Kidnapping of a child</u>

"Generally, to prove the crime of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of *physical force or fear*; (2) the movement was *without the person's consent*; and (3) the movement of the person was for a substantial distance. [Citation.] California courts have recognized, however, that the first two elements raise an analytical problem when the victim is an infant or a very young child because this victim would be incapable of giving consent and can be unlawfully moved without resort to physical force or fear. [Citations.] But these courts have also recognized that to eliminate the lack-of-consent and force elements would potentially permit a kidnapping conviction of an adult who forcibly transports a child for a good or innocuous purpose, which would be inconsistent with legislative intent in enacting the kidnapping statute. [Citation.]" (*People v. Jones* (2003) 108 Cal.App.4th 455, 462 (*Jones*), italics added.)

"To resolve this conceptual problem, the California Supreme Court more than 40 years ago created an additional 'intent' element applicable to the kidnapping of infants or

13.

very young children to substitute for the lack-of-consent element. [Citation.] Although the defendant's purpose or motive is generally not an element of a kidnapping crime, the [California Supreme Court] held that as to minors or others incapable of giving consent a person is guilty of kidnapping under section 207 '*only if the taking and carrying away is done for an illegal purpose or with an illegal intent*.' [Citations.] This additional element precludes a kidnapping conviction against a person who forcibly, but with lawful intentions, moves a child. [Citations.]" (*Jones*, *supra*, 108 Cal.App.4th at p. 462, italics in original; *People v. Oliver* (1961) 55 Cal.2d 761, 768; *In re Michele D.* (2002) 29 Cal.4th 600, 609.)

The prosecution has the burden "to prove this illegal purpose element in place of the lack-of-consent *and* force factors, and that 'the amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance *for an illegal purpose or with an illegal intent*.' [Citation.]" (*Jones*, *supra*, 108 Cal.App.4th at p. 462, italics in original; *In re Michele D.*, *supra*, 29 Cal.4th at p. 610.)

This same concept is applicable when a parent is alleged to have kidnapped his or her own child. It is well-recognized that " '[i]n the absence of an order or decree affecting the custody of a child, it is generally held that a parent … does not commit the crime of kidnapping by taking exclusive possession of the child.' [Citations.]" (*Wilborn v. Superior Court of Humboldt County* (1959) 51 Cal.2d 828, 830.) Thus, without more, one parent cannot be found guilty of taking custody of a child to the exclusion of the other parents. (*Ibid*.; *People v. Senior* (1992) 3 Cal.App.4th 765, 781; *Cline v. Superior Court* (1982) 135 Cal.App.3d 943, 947.)

However, "while a father entitled to custody ordinarily cannot kidnap his own child, his right to physical custody ends when he exercises it for a purpose known to be illegal…." (*People v. Senior*, *supra*, 3 Cal.App.4th at p. 781.) Such a parent "is liable for kidnapping if he or she exercises custodial rights for an illegal purpose. [Citation.]"

14.

(*Ibid.*) "Therefore, in order to convict defendant of kidnapping [his or her own child] under section 207, subdivision (a) the People would have to prove defendant acted for an illegal purpose or with an illegal intent. [Citation.]" (*People v. Ojeda-Parra* (1992) 7 Cal.App.4th 46, 50.) "[W]here the prosecution proves this unlawful purpose element, a parent who has rightful custody of his or her child may be convicted of kidnapping the child. [Citation.]" (*Jones*, *supra*, 108 Cal.App.4th at pp. 462–463; *People v. Senior*, *supra*, 3 Cal.App.4th at p. 781.)

Thus, a parent who has custodial rights to his or her child may be guilty of kidnapping that child, in violation of section 207, subdivision (a), only if the taking and carrying away is done for an illegal purpose or with an illegal intent on the part of the defendant. (*Jones*, *supra*, 108 Cal.App.4th at pp. 463–464; *In re Michele D.*, *supra*, 29 Cal.4th at p. 612.) "[T]he amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (*In re Michele D.*, *supra*, 29 Cal.4th at p. 610; *People v. Platz* (2006) 136 Cal.App.4th 1091, 1104.)

B. **The charges and instructions**

In this case, the first amended information charged defendant with kidnapping E. in violation of section 207, subdivision (a), and alleged that he "did unlawfully, forcibly and by instilling fear, steal, take, hold, detain and arrest [E.] in Kings County … and did take [E.] into Madera County." It was further alleged the victim was under the age of 14 years "and was kidnapped and carried away with the intent to permanently deprive the parent custody of that child, within the meaning of … section 667.85."

The jury was instructed with CALCRIM No. 1201, which correctly stated the elements of kidnapping of a child:

"The defendant is charged in Count 1 of kidnapping a child in violation of … section 207. To prove the defendant is guilty of this crime the People must prove that:

15.

"One, the defendant used physical force to take and carry away an unresisting child.

"Two, the defendant moved the child a substantial distance.

"Three, *the defendant moved the child with an illegal intent or for an illegal purpose*.

"Substantial distance means more than a slight or trivial distance. In deciding whether the distance is substantial, consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the movement increased the risk of physical or psychological harm, increased the danger of [a] foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection. *The People allege that the defendant intended to commit kidnapping for the illegal purpose of selling the child or stalking or furthering the criminal threat*. You may not find the defendant guilty of kidnapping unless you all agree that he intended to commit one of those crimes at the time of the kidnapping. *You do not have to agree on which one of those crimes he intended.*" (Italics added.)

In closing argument, the prosecutor asserted defendant was guilty of kidnapping because he took the baby with the illegal purpose of either selling her in San Francisco, or to follow through on his threats to Arlene to take away her child.

During deliberations, the jury asked the court whether the crime of attempted criminal threats, the lesser included offense to count III, was included with having an illegal intent or purpose. The court consulted with the parties, and both the prosecutor and defense counsel agreed with the proposed instructional response. The court sent the following written response to the jury:

"The last paragraph of jury instruction 1201 … states the People alleged that the defendant intended to commit kidnapping for the illegal purpose of selling the child or stalking, or furthering the criminal threat. The crime of attempted criminal threats is included in furthering the criminal threat."

Defendant was convicted of kidnapping. He was found not guilty of making a criminal threat, but guilty of the lesser included offense of attempted criminal threats.

16.

**C. Analysis**

Defendant contends he could not be convicted of kidnapping his own daughter because he had full custodial rights. He concedes the existence of a TRO, but asserts the TRO did not undermine his custodial rights because it was never served upon him.

There is overwhelming evidence defendant had actual knowledge of the existence of the TRO. It is undisputed, however, that the order was never served upon him. In his various social media posts, defendant mocked Arlene for obtaining the TRO, realized that he was supposed to stay away from Arlene, E., and his parents' house, and even knew that the order was not valid unless it was served on him. Despite this actual knowledge of the existence of the TRO, there is no evidence he knew the order had limited his custodial rights. "[J]ust as the mere filing of a complaint without service of summons confers no jurisdiction, the rendition of the court order did not ipso facto deprive [the father] of his custodial right. [Citation.] Rather, service of the order was a prerequisite to termination of his otherwise undoubted custodial rights. [Citation.] Absent actual knowledge nothing less would satisfy fundamental requirements of due process. [Citation.]" (*People v. Johnson* (1984) 151 Cal.App.3d 1021, 1026.) Thus, as of August 2, 2013, defendant still had full custodial rights to E.

This conclusion does not end our analysis. The jury was properly instructed that defendant was guilty of kidnapping his own child if he "moved the child with an illegal intent or for an illegal purpose," which included "selling the child *or* stalking *or* furthering the criminal threat." (Italics added.) The jury was further instructed that it did not have to agree which of the crimes he intended to commit when he took the child to find defendant guilty of kidnapping.[7]

---

[7] During the instructional conference, the court noted the prosecutor had requested to include the last sentence of CALCRIM No. 1201. The court asked defense counsel if he objected, and counsel said no.

17.

Defendant asserts there is no evidence he intended to commit any crime or had any illegal intent when he took E. from her crib. Defendant concedes Arlene's trial testimony showed "some evidence" of an illegal intent, based upon his prior statements about selling the child in San Francisco. Defendant attempts to impose an arbitrary timeline in this case, and argues his purported statements about selling E. were made "prior to July 2013," which "was at least a month (or longer) before he took possession of the child" on August 2, 2013. Defendant complains there is no evidence he said anything about selling the child in July or August 2013. Defendant instead points to one of his messages to Arlene, that he wanted to visit the child, and asserts this evidence defeats any inference that he took E. with any illegal intent or for an illegal purpose.

Defendant's arguments on this point are meritless. The question of defendant's intent was squarely placed before the jury, and there is substantial evidence to support the jury's verdict that he took E. for the illegal purpose of selling her. The prosecution's theory was that defendant took E., drove north on Highway 99, and was finally stopped over 60 miles from Corcoran because he was going to carry out his long-stated intent to sell the child in San Francisco. There was no evidence that defendant had any connections to friends or another residence in the general direction of where he was traveling. Arlene testified defendant stated his intent to dispose of the child in this manner even before she was born, and his desire to do so continued and intensified after her birth. He even commented that he was going to sell her and make a lot of money because she was a cute child.

Defendant did not make these statements many years before he took E. from her crib, or disavow his previous declarations to Arlene Instead, his social media messages to his friends disparaged Arlene's parenting abilities, wondered whether he could take E. and "disappear" with her, and declared he was about to do something "hateful" that would be covered on television and by the news helicopter. The day before he took E., defendant sent messages to Arlene and made a passing reference to visitation. He also

18.

wrote that it was "war," things were "escalating," he was going to "shake the world in a few days," and most chilling, "I don't really care about the child."

Defendant may not have expressly repeated his intent to take the child to San Francisco and sell her in the 30 days prior to removing E. from her crib; however, the entirety of his messages and statements to Arlene and his friends, the manner in which he crept into the house and took the screaming child, and his detention on a northbound highway, 60 miles from his own home, clearly raised a disputed factual issue as to whether he took the child for the illegal purpose of selling her. There is substantial evidence to support the jury's determination that he took E. for "base antisocial purposes, not for a good or innocent reason. Such a taking is kidnap[p]ing …." (*People v. Campos* (1982) 131 Cal.App.3d 894, 899; *Jones*, *supra*, 108 Cal.App.4th at pp. 466–467.)

Defendant next asserts his conviction for kidnapping is inconsistent with the jury's other verdicts in this case. Defendant notes that the jury found him not guilty of count III, criminal threats; count IV, stalking Arlene, and count V, child endangerment of E. Defendant argues the jury's not guilty verdicts for these three substantive offenses undermine its conclusion that he was guilty of kidnapping for an illegal purpose or with an illegal intent.

As defendant acknowledges, "a jury's verdict with respect to one count can have no bearing upon the meaning or validity of the verdict in other counts, regardless of how similar the facts underlying each count may be. [Citation.]" (*People v. Keltie* (1983) 148 Cal.App.3d 773, 785–786.) In addition, "[i]t is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 656.) The existence of inconsistent verdicts does not imply that the jury must have been confused. (*Ibid*.) "An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict. [Citations.]" (*Ibid*.) "[E]ven if we assume for argument's sake that the jury verdicts were inconsistent, that conclusion, does not, of itself, warrant reversal." (*Ibid*.)

19.

In this case, the kidnapping charge and instruction was in the disjunctive—that the jury could find defendant guilty if he had the illegal purpose of *either* "selling the child *or* stalking *or* furthering the criminal threat," and that the jury did not have to agree "on which one of those crimes he intended." As we have explained, the jury's guilty verdict for kidnapping is supported by substantial evidence of defendant's oft-stated intent to sell the child in San Francisco and his detention on a northbound highway, 60 miles north of Corcoran. The jury's not guilty verdicts for stalking, child endangerment, and criminal threats do not undermine his conviction for kidnapping under the circumstances.

While the jury found defendant not guilty in count III of making a criminal threat, it found him guilty of the lesser included offense of attempted criminal threats. As we will discuss in issue IV, *post*, his conviction for attempted criminal threats is supported by substantial evidence. More importantly, the jury asked the court if defendant's commission of the felony offense of attempted criminal threats could constitute the illegal act or illegal purpose required for kidnapping. The court reinstructed the jury that it could, and defense counsel agreed with the court's instruction.

Defendant further argues that the jury's verdicts were inconsistent because it found him not guilty in count V of child endangerment, which necessarily meant the jury "rejected all claims" that "he intended to cause his child bodily injury or death, or that he intended to sell her in San Francisco." One of the prosecutor's theories for count V, child endangerment, was based on the manner defendant took E. from the house, and E.'s condition when she was recovered from defendant's car. The officer testified E. was restrained in the child seat, but the seat was not secured into the back seat and the child was holding a plastic bag near her head. The jury may have found defendant not guilty of child endangerment by concluding that defendant did not know how to correctly secure the child seat, or appreciate the importance of that act. Nevertheless, the jury's not guilty verdict on child endangerment does not undermine the sufficiency of the evidence that he kidnapped E. for the illegal purpose of selling her in San Francisco.

20.

## II.     Defense Pinpoint Instruction for Kidnapping

Defendant contends the court committed prejudicial error when it denied his request for a pinpoint instruction for count I, kidnapping, and count II, burglary. He asserts the special instruction should have been given because it explained that he had the legal custody to custody of his daughter, which would have undermined both charges.

### A. Background

During the instructional phase, the prosecutor requested a special instruction which elaborated on the pattern instruction for the criminal intent and purpose required for kidnapping a child. Defense counsel offered the following modified version of the prosecution's proposed instruction.

> "In order to prove a violation of … section 207(a), *the People have the burden of proving that the defendant moved the child with an illegal intent, or for an illegal purpose*. While a father entitled to custody ordinarily cannot kidnap his own child, *his right to physical custody ends (when/if) he exercises it for a purpose known to be illegal*. If the People proved that the defendant took his child with an illegal intent or for an illegal purpose, then being the child's biological parent is not a defense to the crime of kidnaping." (Italics added.)

Defense counsel acknowledged that the court indicated that it was going to reject both proposed instructions. The prosecutor clarified that she had withdrawn her requested modification to the pattern kidnapping instruction, and objected to the defense's proposed pinpoint instruction.

The court stated that it would not give the defense's proposed pinpoint instruction.

> "[A]lthough the proposed special instruction correctly sets forth the law, it just reiterates what is already contained in the jury instruction for that …, which is jury instruction [CALCRIM No.] 1201. It adds really nothing of significance. The Court would find that it has a tendency to confuse the jury, and the Court will not be giving that instruction."

In closing argument, defense counsel argued defendant was not guilty of kidnapping because there was no evidence he took the child for an illegal purpose.

Counsel argued defendant and Arlene were involved in a custody and visitation dispute, defendant had the legal right to be with his child, and he was never served with the restraining order.

### B. Analysis

"A criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 11421143.) However, the court is not required to give pinpoint instructions that merely duplicate other instructions. (*People v. Bolden* (2002) 29 Cal.4th 515, 559; *People v. Panah* (2005) 35 Cal.4th 395, 486.)

As we have explained in issue I, *ante*, the jury was correctly instructed with CALCRIM No. 1201 on the elements of kidnapping a child, particularly that defendant moved the child with the illegal intent or for the illegal purpose of "*selling the child or stalking or furthering the criminal threat.*" (Italics added.) Defendant's proposed pinpoint instruction was duplicative of CALCRIM No. 1201 and the court properly declined to give it. CALCRIM No. 1201, and the court's modification of the instruction during deliberations, properly explained the elements of kidnapping a parent's own child, and the requirement that the parent had to take the child for an illegal intent or purpose.

### III. Substantial Evidence of Burglary

Defendant next contends his conviction in count II for first degree burglary must be reversed because there is insufficient evidence he entered the residence with the intent to kidnap E., commit child abuse likely to produce great bodily harm or death, or commit a felony therein.

### A. Background

In count II, defendant was charged with first degree burglary of a building occupied by Arlene and E. (§ 459). The jury was instructed with CALCRIM No. 1700, that to prove defendant was guilty of burglary, the People had to prove defendant entered "with the intent of committing kidnapping *or* child abuse likely to produce great bodily

22.

harm or death. The defendant need not have actually committed kidnapping or child abuse likely to produce great bodily harm or death, as long as he entered with the intent to do so…. You may not find the defendant guilty of burglary unless you all agree that he intended to commit one of those crimes at the time of the entry. *You do not all have to agree on which of those crimes he intended.*" (Italics added.)

### B. Analysis

The elements of first degree burglary are (1) entry into a structure currently being used for dwelling purposes and (2) with the intent to commit a theft or a felony. (§§ 459, 460; *People v. Anderson* (2009) 47 Cal.4th 92, 101, *People v. Sample* (2011) 200 Cal.App.4th 1253, 1261.)

Whether defendant's entry was accompanied by the requisite intent is a question of fact for the jury. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245.) Since intent is rarely susceptible of direct proof, it may be inferred from all the facts and circumstances disclosed by the evidence. (*Ibid.*) " 'Where the facts and circumstances of a particular case and the conduct of the defendant reasonably indicate his purpose in entering the premises is to commit larceny or any felony, the conviction may not be disturbed on appeal.' [Citation.]" (*Ibid.*)

In challenging his burglary conviction, defendant renews many of the same arguments which he raised to his kidnapping conviction. Defendant asserts his conviction for burglary must be reversed because there is insufficient evidence he entered the residence with intent to commit a felony. Defendant argues he had equal custodial rights to E., and there is insufficient evidence he entered the home to kidnap E., commit child abuse likely to produce great bodily injury or death, or commit any felony therein. Defendant concedes the burglary charge was based "on almost the same legal-factual predicates as the kidnapping charge," but argues his conviction for burglary is inconsistent with the jury's not guilty verdict for child endangerment.

23.

We have already found there is substantial evidence to support defendant's conviction for kidnapping for the illegal purpose of selling E., regardless of the jury's verdicts on the other substantive counts. As with kidnapping, the burglary charge was also in the disjunctive—that the People had the burden to prove defendant entered the house "with the intent of committing kidnapping *or* child abuse likely to produce great bodily harm or death." Defendant's conviction for burglary is supported by substantial evidence that he entered the house to kidnap E., and the jury's not guilty verdict for count V, child abuse, is not inconsistent with the conviction for burglary.

## IV. Substantial Evidence of Attempted Criminal Threat

In count III, defendant was alleged to have committed the offense of making a criminal threat in violation of section 422—that between June 15 and August 2, 2013, he "did willfully and unlawfully threaten to commit a crime which would result in death or great bodily injury to [E.], with the specific intent that the statement be taken as a threat by [Arlene]." The jury was instructed that attempted criminal threat, committed during the same time period, was a lesser included offense.

Defendant was found not guilty of making a criminal threat, but guilty of the lesser included offense of attempted criminal threat. Defendant contends there is insufficient evidence to support this conviction.

### A. Criminal threats

"In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made,... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and

24.

an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*).)

## B. **Attempted criminal threat**

The crime of attempted criminal threat is a lesser included offense of making a criminal threat. (*Toledo*, *supra*, 26 Cal.4th at p. 230; *People v. Chandler* (2014) 60 Cal.4th 508, 513, 515 (*Chandler*).) "Under the criminal attempt statute, attempted criminal threat requires 'a specific intent to commit the crime' of criminal threat 'and a direct but ineffectual act done toward its commission.' [Citation.]" (*Chandler*, *supra*, at p. 516.)

"[A] defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat, under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*Toledo*, *supra*, at p. 230.)

"[T]he crime of attempted criminal threat requires not only proof of a subjective intent to threaten but also proof that the intended threat under the circumstances was sufficient to cause a reasonable person to be in sustained fear." (*Chandler*, *supra*, 60 Cal.4th at p. 511.)

25.

"A variety of potential circumstances fall within the reach of the offense of attempted criminal threat. For example, if a defendant takes all steps necessary to perpetrate the completed crime of criminal threat by means of a written threat, but the crime is not completed only because the written threat is intercepted before delivery to the threatened person, the defendant properly may be found guilty of attempted criminal threat. Similarly, if a defendant, with the requisite intent, orally makes a sufficient threat directly to the threatened person, but for some reason the threatened person does not understand the threat, an attempted criminal threat also would occur. Further, if a defendant, again acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat. In each of these situations, only a fortuity, not intended by the defendant, has prevented the defendant from perpetrating the completed offense of criminal threat itself." (*Toledo*, *supra*, 26 Cal.4th at pp. 230–231, italics in original.)

"[I]n most instances the crime of attempted criminal threat will involve circumstances in which the defendant in fact has engaged in *all* of the conduct that would support a conviction for criminal threat, but where the crime of criminal threat has not been completed only because of some fortuity outside the defendant's control or anticipation (for example, because the threat is intercepted or not understood, or because the victim for some reason does not actually suffer the sustained fear that he or she reasonably could have sustained under the circumstances)…." (*Toledo*, *supra*, 26 Cal.4th at p. 234, italics in original.)

## C. <u>Analysis</u>

Defendant contends there is no evidence he threatened to harm or injure E., his alleged threats to sell her did not occur within the alleged time period of June 15 to

August 2, 2013, the text messages he sent to Arlene shortly before the kidnapping only stated his intent to visit the child, and the jury's guilty verdict for attempted criminal threats is inconsistent with the not guilty verdicts for stalking and child endangerment.

As we have already explained, "a jury's verdict with respect to one count can have no bearing upon the meaning or validity of the verdict in other counts, regardless of how similar the facts underlying each count may be. [Citation.]" (*People v. Keltie*, *supra*, 148 Cal.App.3d at p. 785–786.) More importantly, defendant was convicted of *attempted* criminal threats, which meant the jury found defendant had the specific intent to commit a criminal threat but the crime was not completed "only because of some fortuity outside the defendant's control or anticipation .…" (*Toledo*, *supra*, 26 Cal.4th at p. 234.)

Defendant demonstrated this specific intent, in the relevant time period, through his statements and text messages to Arlene, which must be considered in the context of their entire relationship and defendant's statements to his acquaintances. On or about July 1, 2013, defendant grabbed E., barricaded himself in the trailer's bathroom with the child, and then slapped Arlene  Later that month, defendant banged on the doors and windows, and sent Arlene a text message that he could break into the trailer, and "[t]here was nothing [she] could do about it." Arlene testified about another incident in July 2013, just before she moved from Tulare to Corcoran, when defendant said he was going to sell E., and the child would be better off in foster care.

Defendant's numerous Facebook posts are also relevant to this issue. While these statements were made to his friends and not to Arlene, they are indicative of his specific intent at that time. In July and August 2013, defendant asked his friends if it was legal to take E. and disappear, and he mocked Arlene's protective order since he was never served. He also bragged that something "hateful" and "huge" was going to happen, there was "a surprise on the horizon," he would be on primetime news, and it would be covered by the news helicopter.

27.

More importantly, just days before he took E., defendant sent a message to Arlene and warned her not to escalate things. While he made his first brief reference to visitation, he also wrote it was "war time," the restraining order was "trash" since he was never served and, most ominously, he was going to "shake the world in a few days" and "I really don't care about the child."

There is substantial evidence defendant *specifically intended to threaten* to commit a crime resulting in death or great bodily injury—taking E. and selling her. He made the threat throughout their relationship, he repeated the threat to Arlene during the alleged time period, and sent her chilling messages indicative of his specific intent toward the child. The recipient of these threats reasonably could have been placed in fear.

However, the record suggests the jury likely found defendant guilty of *attempted* criminal threats, instead of the completed offense, by concluding defendant's threats did not actually cause Arlene to be *in sustained fear*. As explained by *Toledo*, "if a defendant … acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Toledo*, *supra*, 26 Cal.4th at pp. 230–231, italics in original.)

Arlene could have been in sustained fear from defendant's initial threats about E. The jury may have concluded, however, that Arlene's specific fear dissipated to some degree with the passage of time (albeit a short period of a few months). Arlene admitted that she continued to live with defendant when he initially threatened to sell their child. When Arlene obtained the restraining order in July 2013, she was admonished by the police that the dispute was a civil matter, and the order was not effective, unless the order was served on defendant. She understood the order was not valid and could not protect her and E. unless it was served, but there is no evidence she took the necessary steps to

28.

effectuate service, or asked the police how to do so. When defendant acted to carry out his threats and actually abducted E., the jury may have viewed these acts as indicative of defendant's intent to fulfill his threats. Under these circumstances, the jury could have concluded from Arlene's inaction for a period of time that she did not "*actually* suffer the sustained fear that … she reasonably could have sustained under the circumstances .…" (*Toledo*, *supra*, 26 Cal.4th at p. 234, italics added.)

## DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
KANE, Acting P.J.


_____
FRANSON, J.

29.