Filed 8/12/16  P. v. Jackson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C077072 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F03496) |
| v. | |
| KHALIL OSHAR JACKSON et al., | |
| Defendants and Appellants. | |

Convicted in a number of robberies in south Sacramento in May 2013, defendants Khalil Oshar Jackson and Nico Maurice Pagan appeal, contending mostly that the evidence was insufficient to support some of their convictions.  Jackson also contends he was denied one day of presentence custody credit.  We agree with Jackson regarding the custody credit and agree with Pagan regarding two of his four convictions but otherwise find the evidence sufficient.  Accordingly, with respect to Jackson, we will modify the judgment and affirm it as modified.  With respect to Pagan, we will reverse his

1

convictions on counts six and seven, modify his sentence accordingly, and affirm the judgment as modified.

FACTUAL AND PROCEDURAL BACKGROUND

*The Robbery Of Suzie's Adult Bookstore -- May 9, 2013*

At approximately 1:00 a.m. on May 9, 2013, Robert Schrader, who was taking his lunch break from his job working security at Suzie's Adult Bookstore at Florin and Franklin, was on his way to his car at the far end of the parking lot when he saw three men standing together at the front of the parking lot. When Schrader was about 100 to 150 feet from the front door of the store and probably about three feet from the driver's door of his car, one of the men came up to him, put a pistol to his side, and told him to walk back inside the store, which he did. All three men had their faces partially covered and were carrying guns. One of them had a long shotgun.

Once inside the store, Schrader was instructed to go behind the "cash wrap" and lie face down, which he did. One of the men with a pistol ordered the employee working the cash register, Richard Abodeely, to put the money from the register into a bag. Abodeely put approximately $700 from two registers and from underneath one of the registers into the bag.

According to Abodeely, the barrel of the shotgun "looked a little bit longer than the average shotgun would look." According to another person in the store at the time of the robbery (Robert Gillies), the gun appeared to be a 12-gauge shotgun with a ribbed barrel. Still photographs taken from a surveillance video recorded inside the store during the robbery show a man wearing a grey hooded sweatshirt and a white shirt covering the lower half of his face holding a long-barreled shotgun. Other photographs show this person wearing dark sweat pants with white stripes and athletic shoes.

A week after the robbery, Sacramento County Sheriff's Detective Mike French obtained the surveillance video from the store and familiarized himself with the shotgun,

2

the athletic shoes, and the exposed portion of the face of the person who held the shotgun. At trial, he described the shoes as "a unique pair of athletic high-top basketball-type shoes" that "were multicolored with a unique design on the sides, as well as having a white sole."

When Detective French later learned that Jackson had been arrested, and that Jackson and his partner were in possession of a full-length shotgun, Detective French believed there was a very good possibility the shotgun could be related to the one used in the bookstore robbery because robberies committed with shotguns are relatively rare. Accordingly, on July 1, 2013, Detective French obtained from a detective with the Sacramento Police Department the shotgun and photographs of the shoes Jackson was wearing when he was arrested. When he compared the shoes Jackson was wearing with those shown in the surveillance video, they appeared to him "to be one and the same from every angle that you could view them."

*The Robbery Of Lichine's Liquors -- May 21, 2013*

Around 9:00 p.m. on May 21, 2013, Edward Cooper and Gerald Okumura were working at Lichine's Liquor on South Land Park Drive near Florin Road, when two men entered the store. Both men had shirts covering their faces, and one of them had a long-barreled, 12-gauge pump shotgun. The man with the shotgun asked, "Where is the money?" Okumura opened the cash register, and the other man (whom the parties stipulated was Jeremiah Botley) went behind the counter and dumped the bills and the coins from the register drawer into a bag or a shirt. The two men then ran out the door.

*The Traffic Stop -- May 21, 2013*

Around 9:15 p.m. on May 21, 2013, Sacramento Police Detective John Montoya was working a uniformed patrol assignment in a marked police car in south Sacramento when he noticed a white Acura Integra traveling southbound on 24th Street make a left turn onto eastbound Meadowview Road at a rate of speed faster than surrounding traffic.

3

At the time, Detective Montoya was northbound on 24th Street, getting ready to turn eastbound on Meadowview. As his was the first car at the limit line, he figured that the occupants of the Integra would have had to see him.

Detective Montoya saw the Integra travel eastbound on Meadowview for a distance of 50 to 100 yards and then very quickly make a U-turn in front of an apartment complex and drive back westbound toward 24th Street. The detective followed. At the corner of Meadowview and 24th, the Acura turned right onto 24th without stopping at a red light, then very quickly pulled into the parking lot of a liquor store. Detective Montoya pulled in behind them.

There were three men in the Acura. The driver was Pagan. Jackson was in the right front passenger seat, and Botley was the rear passenger. Detective Montoya patted them all down for weapons but did not find any. He later placed Pagan in the back of his patrol car, where Pagan can be seen on video counting bills that he removed from his pocket. About 18 minutes later, Pagan was still in the back of the patrol car, now with Jackson, and Pagan can be seen on video removing a handful of coins from his pocket and passing them back and forth from one hand to the other.

Detective Montoya did not find a shotgun in the Acura.

*The Robbery Of 7-Eleven -- May 22, 2013*

During the nighttime on May 22, 2013, a man named Jaspal (no other name) was working at a 7-Eleven on 43rd Avenue. At some point, a man came in who caught Jaspal's attention because he was looking around and talking on the phone. The man eventually asked Jaspal to pay him a dollar for a scratch-off lottery ticket, and when Jaspal opened the cash register to get the money, the man leaned forward to look into the cash drawer. Right after the man left, two other men entered the store; one was wearing a black Spider-Man mask and the other had his face covered with a handkerchief. The man

4

in the mask showed Jaspal part of a gun in his pocket and asked Jaspal to open the register and give him money, which Jaspal did.

*The Robbery Of Food Stop -- May 24, 2013*

On the afternoon of May 24, 2013, Umair Aslam was working the cash register at Food Stop in south Sacramento, off of Meadowview Road and Amherst Street, when two men -- one carrying a "very large shotgun" and the other carrying what appeared to be a handgun -- entered the store and robbed him. Both men had their faces covered with T-shirts wrapped around their heads. Aslam put the money in a bag, and the men ran out. Aslam followed and saw a white Acura, probably a late '90's model Integra, speed off. Surveillance video from the store showed that the two men got out of a white Acura before they entered the store for the robbery.

*The Attempted Robbery Of The Arco AM/PM -- May 30, 2013*

At around 11:00 p.m. on May 30, 2013, Sacramento Police Officer Ryan Trefethen was on patrol in south Sacramento when he noticed a dark-colored SUV without any taillights illuminated pulling around the back of the Arco AM/PM gas station on the northwest corner of Florin Road and Amherst Street. Officer Ryan turned north on Amherst and looked behind the gas station but did not see the SUV, so he intended to just keep driving north when he saw two people walking southbound toward the gas station on the sidewalk on the west side of the street. The two individuals had hooded sweatshirts pulled over their heads and white shirts covering their faces. As Officer Trefethen watched the two individuals continue toward the gas station, he saw that the "tall skinny" one -- whom Officer Trefethen identified at trial as Jackson -- was wearing jeans and shoes that appeared to match pictures he had seen from an information bulletin on the recent robberies in the area, including Lichine's Liquor, Food Stop, and Suzie's Adult Book Store.

5

Officer Trefethen called dispatch to report the suspects, then made a U-turn. As he did so, he lost sight of the two individuals momentarily as they were walking past a shrub. When he regained sight of them, he saw them enter the property of the gas station, then head toward the sidewalk on Florin Road. The second individual (Ronnie Pannell) sat down on a bus stop bench, and Jackson walked westbound along Florin. Eventually, another officer pulled up to the bus stop and Officer Trefethen pursued Jackson, apprehending him at the corner of Florin Road and Freeport Boulevard. The officer did not find any weapons on Jackson but did find a white T-shirt under the collar of his hooded sweatshirt. Later, he found a blue walkie-talkie in Jackson's pants pocket tuned to channel 22.

After placing Jackson in the back of a patrol car and seeing that Pannell was in the back of another, Officer Trefethen retraced the course of the two men to see if they had dropped any contraband or weapons. When he reached the shrub where he had lost sight of them momentarily, he found a full-length pump shotgun sitting on top of the shrub.

Kathleen Boyd, a forensic investigator with the Sacramento Police Department, obtained 16 latent prints from the shotgun. Kathleen Modeste, a latent print examiner with the department, matched two of the latent prints to Jackson and two of the prints to Pagan.

*Postarrest Investigation*

Pagan was stopped and arrested on May 31, 2013, in a white Acura Integra. On the front passenger seat of the Integra was a blue walkie-talkie tuned to channel 22 that appeared identical to the walkie-talkie found on Jackson the day before.

Sacramento Police Detective Jimmy Lee Vigon showed Pagan an image of a person taken from surveillance video at the Food Stop on May 24, just before the robbery, and Pagan admitted it was him. Detective Vigon also testified there were "some very striking similarities between" the white car observed in connection with the Food

6

Stop robbery and the white Acura Integra Pagan was driving when he was stopped and arrested that led the detective to believe they were the same vehicle. When Detective Vigon showed Pagan an image of the white car from the Food Stop video, Pagan initially identified it as his girlfriend's car but later said it was not and, "out of the blue," told Detective Vigon, "you're not gonna trick me into admitting I drove anybody there to do a robbery."

On June 13, 2013, Sacramento Police Detective Mike Mullaly was at the 7-Eleven on 43rd Avenue on another matter, when the store manager mentioned to him that the store clerk had seen someone suspicious in the store before the robbery on May 22 who could be seen on the surveillance video. Detective Mullaly looked at the video and recognized the person as Pagan.

Detective Mullaly also conducted an investigation into some robberies that were committed by a man named Greg Gadlin. During a search of the bedroom in Gadlin's residence, a black Spider-Man mask was found. On May 6, 2013, Pagan had answered the door at Gadlin's apartment when a parole agent came looking for Gadlin, telling the agent that his "homeboy" was not there.

*Charges, Convictions, And Sentencing*

Jackson was charged with the attempted robbery of the Arco AM/PM gas station (count one), the robbery of Suzie's (counts three and four), the kidnapping of Schrader (count five), and the robbery of Lichine's Liquor (counts six and seven). Pagan was charged with the robbery of Food Stop (count two), the robbery of Lichine's Liquor (counts six and seven), and the robbery of 7-Eleven (count eight). The information also alleged various firearm enhancements and a prior serious felony conviction as to Pagan.

The jury found both defendants guilty of all charges and found all the firearm enhancement allegations true. The trial court found that Pagan had a prior serious felony

7

conviction.  The court sentenced Jackson to 29 years in prison and Pagan to 18 years in prison.  Both defendants timely appealed.

DISCUSSION

I

*Sufficiency Of The Evidence*

A

*Standard Of Review*

"Our role in reviewing the sufficiency of the evidence in a criminal case is a limited one.  [Citation.]  We examine the entire record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  [Citations.]  Substantial evidence is ' "evidence which is reasonable, credible, and of solid value." '  [Citation.]  Although 'mere speculation cannot support a conviction' [citation], the trier of fact is entitled to draw reasonable inferences from the evidence and we will ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " '  [Citations.]  [¶]  The standard of review remains the same in a case based upon circumstantial evidence.  [Citation.]  ' "[W]e must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.  [Citations.]"  [Citation.]'  [Citation.]  We must decide whether the circumstances reasonably justify the jury's findings, but 'our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment.' "  (*People v. Bohana* (2000) 84 Cal.App.4th 360, 367-368.)

Evidence is substantial if "a reasonable and impartial mind could justifiably draw the same inferences therefrom that the jury necessarily drew in order to arrive at its verdict," and "evidence does not become unsubstantial simply because other reasonable

8

minds might differ as to what inferences should be drawn therefrom, or because this court as a trier of fact might have drawn different inferences." (*People v. Bertholf* (1963) 221 Cal.App.2d 599, 603.)

B

*Jackson -- The Robbery Of Suzie's Adult Bookstore*

Jackson concedes the evidence was sufficient to convict him of attempting to rob the Arco AM/PM gas station (count one) and of robbing Lichine's Liquor (counts six and seven), but he contends the evidence was insufficient to convict him of robbing Suzie's Adult Bookstore or kidnapping Schrader during that robbery. In Jackson's view, "Taken in the light most favorable to the verdict, all that connected [him] to the Suzie's incident was security footage showing a masked Black man carrying a shotgun that looked similar to the shotgun [he] later used, and that the masked man was wearing typical looking sneakers similar to those [Jackson] was apprehended wearing." We disagree.

Ten years ago, this court explained that "to prevail on a sufficiency of the evidence argument, the defendant must present his case to us consistently with the substantial evidence standard of review. That is, the defendant must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict. [Citation.] If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.) Though we (and other courts) have had many occasions to repeat these principles in the decade since *Sanghera*, "[n]o one seems to listen." (*Overton v. Vita-Food Corp.* (1949) 94 Cal.App.2d 367, 370.)

9

The argument by Jackson's appellate attorney that *all* that connected Jackson to the Suzie's robbery and kidnapping were some vague similarities between (1) the shotgun that was used in that incident and the gun that was later found discarded near the Arco AM/PM gas station and (2) the "typical looking sneakers" worn by one of the robbers and by Jackson when he was arrested for attempting to rob the gas station is not, even by the wildest stretch of the imagination, sufficient to comply with *Sanghera*. And as in *Sanghera* itself, support for the jury's verdict here lies in the evidence Jackson's attorney ignores.

Take, for instance, the shoes. Counsel asserts that the shoes shown in the video from the Suzie's robbery on the person carrying the shotgun "are nothing more than typical sneakers. There is nothing distinctive about them." But that is only counsel's subjective characterization of them, which is directly contrary to the evidence admitted at trial. As we have explained, at trial Sacramento County Sheriff's Detective Mike French described the shoes worn by the robber with the shotgun as "a unique pair of athletic high-top basketball-type shoes" that "were multicolored with a unique design on the sides, as well as having a white sole." He further testified that when he compared those shoes "to the shoes that Khalil Jackson was . . . wearing at the time of his arrest, they appear to be one and the same from every angle that you could view them." Detective French then proceeded to examine the actual shoes Jackson was wearing when he was arrested and explained to the jury the particulars in which those shoes matched the shoes shown on the surveillance video from the Suzie's robbery.

We could offer similar observations about the evidence regarding the distinctive characteristics of the shotgun. We could also explain how the evidence that Jackson participated in the robbery of Lichine's Liquor (which Jackson does not contest) is further supportive of the jury's verdict that he participated in the robbery of Suzie's using the very same shotgun. But it is not our job to explain to Jackson, or to Jackson's

10

appellate attorney, how the evidence supports the jury's verdicts -- at least, not in the absence of a legally proper argument as to why the evidence does *not* do so. Here, Jackson's appellate attorney has not offered any such argument. Viewed in the light most favorable to the jury's verdicts, the evidence was sufficient for the jury to find that Jackson was the man carrying the shotgun during the robbery of Suzie's.

## C

### *Jackson -- The Kidnapping*

Jackson contends that even if there was sufficient evidence that he was the person who wielded the shotgun in the bookstore robbery, his conviction for the kidnapping of Schrader "must still be reversed for lack of substantial evidence that the victim was moved a legally substantial distance." We disagree.

"Generally, to prove the crime of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance." (*People v. Jones* (2003) 108 Cal.App.4th 455, 462.) To constitute kidnapping, " 'the victim's movements must be more than slight [citation] or "trivial" [citation], they must be substantial in character . . . .' " (*People v. Martinez* (1999) 20 Cal.4th 225, 233, quoting *People v. Stanworth* (1974) 11 Cal.3d 588, 601.) "[I]n determining whether the movement is ' "substantial in character" ' [citation], the jury should consider the totality of the circumstances. Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Martinez*, at p. 237.) Also, "in a case involving an associated crime, the jury should be instructed to consider

11

whether the distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality." (*Ibid.*)

Focusing on this last factor, Jackson contends that in this case "the movement was, as a matter of law, slight or trivial because it was completely and merely incidental to the robbery." We disagree. Our Supreme Court made clear in *Martinez* that the substantiality of the victim's movements must be assessed based on the *totality* of the circumstances. While the question of whether the movement was incidental to the commission of an associated crime is *one* of those circumstances, it is only one. (See *People v. Bell* (2009) 179 Cal.App.4th 428, 440 [jury had to take into account "(as one factor among others) whether [the defendant's] movement of [the victim] was merely incidental to the [associated crime]"].)

Thus, the question here is whether, on the evidence presented, the jurors were foreclosed from finding that the movement of Schrader was substantial in character based on *all* of the relevant circumstances. We do not believe they were. In arguing otherwise, Jackson contends that: (1) "the movement of Schrader was all within the premises of the bookstore; from the parking lot back into the store itself," which "took far less than a single minute"; and (2) "the movement of the victim was not only for a short distance, but it was essential to the robbery" because "[t]he armed and masked perpetrators could not walk past a security guard who they saw exiting the store that was the object of the robbery." Even taking these contentions as true, we do not agree that the movement of Schrader had to be characterized as "slight" or "trivial" as a matter of law. The evidence showed that the robbers apprehended Schrader as he was about 100 to 150 feet from the front door of the store and probably about three feet from the driver's door of his car. By preventing Schrader from getting into his car and potentially leaving the vicinity of the bookstore altogether on his lunch break, the robbers necessarily increased the risk of harm to Schrader, as they put him back into the store, right into the middle of the armed

12

robbery. At the same time, they decreased the likelihood that their crime would be detected while it was occurring by forcing Schrader to reenter the store and lie on the floor while they completed the robbery. Also, they increased the danger arising from possible attempts by Schrader to interfere with the crime while it was occurring.

Under the totality of the circumstances presented here, the jury was reasonably justified in finding that the robbers moved Schrader a distance that was neither slight nor trivial but was instead substantial in character. Accordingly, Jackson's conviction for kidnapping is supported by substantial evidence.

D

*Pagan -- The Robbery Of Lichine's Liquor*

Pagan contends the evidence was insufficient to convict him of the two counts (counts six and seven) relating to the robbery of Lichine's Liquor because there was no substantial evidence that he had the intent to aid and abet Jackson and Botley -- the perpetrators of the Lichine's Liquor robbery -- before or during the carrying away of the "loot" to a place of temporary safety. According to Pagan, Jackson and Botley "had reached a temporary place of safety prior to the traffic stop, because there was no flight, no stolen property or weapon found inside the car, and there was no investigation into the robbery at the time of the traffic stop." For the reasons set forth below, we agree with Pagan that the evidence was insufficient to support a finding that he aided and abetted Jackson and Botley in their robbery of Lichine's Liquor. Accordingly, we will reverse Pagan's two convictions related to that robbery (counts six and seven) and modify his sentence accordingly.

"[T]he commission of a robbery for purposes of determining aider and abettor liability continues until all acts constituting the robbery have ceased. The asportation, the final element of the offense of robbery, continues so long as the stolen property is being carried away to a place of temporary safety. Accordingly, in order to be held liable as an

13

aider and abettor, the requisite intent to aid and abet must be formed *before or during such carrying away of the loot to a place of temporary safety*. Therefore, a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1161.) "A perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property." (CALCRIM No. 1603.) "Whether a defendant has reached a place of temporary safety is a question of fact for the jury." (*People v. Johnson* (1992) 5 Cal.App.4th 552, 559.)

Under the foregoing principles, for the jury to find Pagan guilty as an aider and abettor of the robbery of Lichine's Liquor, there had to be substantial evidence from which the jury could reasonably conclude that Pagan: (1) served as the getaway driver for Jackson and Botley; and (2) formed the intent to aid and abet the robbery before Jackson and Botley had successfully escaped from the scene of the robbery, were no longer being pursued, and had unchallenged possession of the money taken in the robbery. We conclude the evidence here was not sufficient to support that conclusion.

The evidence showed that the robbery of Lichine's Liquor, which is located near the intersection of Florin Road and South Land Park Drive, occurred "around 9 o'clock." Approximately 15 minutes later, "around 9:15," Detective Montoya saw Pagan making a turn at a rate of speed faster than surrounding traffic at the intersection of 24th Street and Meadowview Road.[1] No evidence was presented about where Jackson and Botley were

---

[1]     Detective Mullaly testified that "it was determined to be about 24 minutes" "between the robbery at the Lichine's Liquor store and the vehicle stop," but the basis for that determination was not supplied to the jury, and other evidence supports the

14

during those 15 minutes, and no evidence was presented about where Pagan was during that same period or at the time of the robbery. Also, there was no direct evidence that Pagan knew Jackson and Botley were going rob the liquor store and no direct evidence that he intended to help them do so by serving as their getaway driver. Under these circumstances, it is reasonably possible that Pagan had no prior knowledge of the robbery and that Jackson and Botley had already reached a place of temporary safety -- in that they had successfully escaped from the store on foot, were not being pursued, and had unchallenged possession of the stolen money -- *before* they ever got into Pagan's car. Thus, the evidence was insufficient to support Pagan's conviction as a getaway driver on an aiding and abetting theory.

The People contend that "Pagan's driving conduct demonstrated that he was still acting as the getaway driver for the two robbers" when Officer Montoya encountered Pagan's vehicle at the intersection of 24th Street and Meadowview Road because Pagan's driving "demonstrate[d] that he was trying to avoid contact with the police." The People also rely on the fact that "Pagan was in possession of a large amount of cash and coins when he was stopped by Officer Montoya," that Pagan's fingerprints were found on the shotgun that might have been used in the robbery, and that Pagan was involved in the 7-Eleven and Food Stop robberies days later.

With respect to Pagan's driving, the People fail to point to any substantial evidence that would support a finding that Pagan's vehicle was in continuous flight from the scene of the robbery when Officer Montoya first saw that vehicle turning on to Meadowview Road from 24th Street. No evidence was presented that Pagan's vehicle was ever near the liquor store, nor was there any evidence regarding the distance from the store to the intersection or any evidence of any pursuit following the robbery.

---

conclusion that only about 15 minutes elapsed between the robbery and Officer Montoya's first sighting of Pagan's vehicle.

15

Furthermore, no shotgun was found in Pagan's vehicle. Although the jury reasonably could have found that Pagan attempted, however briefly, to evade Officer Montoya, that evasion was more likely attributable to the fact that Pagan knew Officer Montoya had seen Pagan speeding while turning on to Meadowview Road than to the fact that Pagan was in continuous flight from the scene of the robbery.

As for the fact that Pagan could be seen on video counting bills and playing with a handful of coins that he removed from his pocket in the back of the patrol car following the traffic stop by Officer Montoya, the People do not point to any substantial evidence that this money was the "loot" from the liquor store robbery. One of the store clerks testified there was "[m]aybe a hundred, 200 bucks, around there" in the cash register at the time of the robbery, while the other testified there was "maybe about 60, 50 bucks, something like that." The People assert that "[r]eview of the video [from the patrol car] demonstrates that the amount of cash and coins taken from the [liquor store] robbery was consistent with the amount of cash and coin on . . . Pagan's person," but it is not readily apparent from the video just how much cash Pagan had. Moreover, the People do not address why Pagan, who did not personally participate in the robbery, could have been expected to have *all* of the "loot" from that robbery, with Jackson and Botley having none.

As for Pagan's fingerprints on the shotgun and his involvement in two other robberies days later, that evidence -- like all of the other evidence on which the People rely -- is not sufficient to prove that Pagan knowingly served as the getaway driver for the robbery of Lichine's Liquor at a time before the robbers had successfully escaped from the scene of the robbery, were no longer being pursued, and had unchallenged possession of the money taken in the robbery. In short, on the evidence presented, there simply was no substantial evidence to support Pagan's convictions for the robbery of Lichine's Liquor. Accordingly, those convictions must be reversed.

16

In sentencing Pagan to an aggregate prison term of 18 years, the trial court imposed two-year sentences on each of the convictions relating to the robbery of Lichine's Liquor (counts six and seven) (one-third the middle term doubled under the three strikes law). Consequently, we will modify Pagan's sentence by striking those two two-year terms, leaving him with an aggregate sentence of 14 years.

E

*Pagan -- The Robbery Of 7-Eleven*

Pagan contends the evidence was insufficient to prove he aided and abetted the robbery of 7-Eleven because the entire charge against him was "based upon speculation that Gregory Gadlin committed the robbery." According to Pagan, the assumption "that Gadlin was one of the robbers, is the foundation of the charge against [Pagan], and absent this assumption the mask found in Gadlin's home and [Pagan] being at his residence two weeks before the robbery is irrelevant."

Again, however, we find that the argument by Pagan's appellate attorney is contrary to the principles of *Sanghera* in that it does not account for all of the evidence or view all of that evidence in the light most favorable to the jury's verdicts. The evidence showed that Pagan entered the 7-Eleven and behaved in a manner that was consistent with casing the store for an upcoming robbery, including looking into the cash register drawer. Right after Pagan left, two other men entered the store; one was wearing a black Spider-Man mask and the other had his face covered with a handkerchief. They robbed the store. A black Spider-Man mask was found at the residence of Gadlin, whom Pagan described as his "homeboy." In addition, there was the evidence that Pagan participated in a similar manner in the robbery of Food Stop -- casing the store before the actual robbery. Taken as a whole and viewed in the light most favorable to the jury's verdicts, the evidence was sufficient to support the jury's finding that Pagan aided and abetted the robbery of 7-Eleven.

17

## II

### *Custody Credits*

Jackson contends his judgment must be modified to reflect one additional day of presentence custody credits. The People agree, and so do we. At sentencing, the trial court stated that Jackson had "428 days actual" -- that is, 428 days in presentence custody. In fact, Jackson spent 429 days in presentence custody, from May 30, 2013, until he was sentenced on August 1, 2014. We will modify the judgment accordingly.

### DISPOSITION

Jackson's judgment is modified to reflect that he has 429 days of actual presentence custody credits. As modified, Jackson's judgment is affirmed.

Pagan's convictions relating to the Lichine's Liquor robbery (counts six and seven) are reversed, and Pagan's judgment is modified by striking the two-year prison term imposed on each of those convictions. As modified, Pagan's judgment is affirmed.

The trial court is directed to prepare amended abstracts of judgment for both defendants and to forward those amended abstracts to the Department of Corrections and Rehabilitation.

/s/
Robie, Acting P. J.

We concur:

/s/
Duarte, J.

/s/
Renner, J.

18