[No. D039146. Fourth Dist., Div. One. Apr. 1, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
MARSHALL JONES, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*The opinion is certified for publication with the exception of parts V. and VI.

**COUNSEL**

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holley A. Hoffman and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HALLER, J.**—Marshall Jones killed his four-month old son, Wolfgang, and then buried him in an empty dirt lot. At the time, Jones did not have legal or physical custody of the child. The jury found Jones guilty of first degree murder, kidnapping, and assault on a child under eight years of age (Pen.

Code, §§ 187, subd. (a), 207, subd. (a), 273ab), and found true a special circumstance allegation that the murder was committed while Jones was committing or attempting to commit kidnapping (Pen. Code, § 190.2, subd. (a)(17)).[1] The court sentenced Jones to life without the possibility of parole on the murder during a kidnapping special circumstance, and stayed the sentences on the kidnapping and assault counts.

On appeal, Jones argues the kidnapping conviction is factually and legally unsupported and therefore the kidnapping and first degree murder convictions and special circumstance finding must be reversed. For the reasons explained below, we reject Jones's contentions and affirm the judgment after modifying the abstract of judgment to correct a clerical error.

## FACTUAL SUMMARY

In 1998, 17-year old Benjamie Winfree (Benjamie) began dating 29-year-old Jones. One year later, in November 1999, Benjamie became pregnant with Jones's child, and then told Jones she no longer wanted to date him. Jones became obsessed with getting back together with Benjamie, and made numerous attempts to contact her.

In May 2000, when Benjamie was approximately six months pregnant, her father (Mr. Winfree), who is an attorney, successfully represented Benjamie at a court hearing to obtain a restraining order against Jones. Jones complied with the restraining order, but continued to attempt to contact Benjamie through her mother (Mrs. Winfree).

In August 2000, Benjamie gave birth to Wolfgang. Three weeks later, a family court mediator met with Benjamie and Jones to evaluate the parents for a custody determination. During the mediation sessions, the mediator found that Jones was focused only on Benjamie, and not on the child, and would "mad-dog" stare at Benjamie. Jones further appeared to have a substantial alcohol abuse problem. The mediator thus recommended that Benjamie be granted sole legal and physical custody with supervised visitation for Jones. Jones thereafter expressed substantial anger towards Mr. Winfree, blaming Mr. Winfree for Benjamie's decision not to reconcile with Jones. At one point, Jones told a coworker that if he could not have Wolfgang, then nobody could and Jones would send Wolfgang back to God.

Three months later, in December 2000, Benjamie was considering getting back together with Jones, and, at one point, agreed to marry him. Mr. Winfree disapproved of the marriage, and ultimately convinced Benjamie

---

[1] All further statutory references are to the Penal Code.

not to marry Jones. On the evening of December 26, Benjamie told Jones that she decided she could not marry him, and that her father had talked her out of it. Jones became angry, and repeatedly said "I am this close to snapping." Jones also said "I am going to do something that makes front page news." When Jones drove Benjamie back to her parents' house, she agreed to come to his apartment the next day.

The next day, Jones picked up Benjamie, Wolfgang and Benjamie's younger sister (Sarah), and drove them to his apartment. Jones had a stroller in his car, and appeared to be upset. After they arrived at Jones's apartment, Jones and Sarah drank numerous beers. Jones again stated he wanted to marry Benjamie, but Benjamie reiterated that she could not marry him.

When they went outside the apartment to leave about 5:45 p.m., Benjamie was holding Wolfgang. Jones abruptly took Wolfgang from Benjamie's arms, and Wolfgang began crying. Jones put Wolfgang in the car, but would not let Benjamie or Sarah into the car. Jones then "jerked" his car into reverse, and Benjamie yelled at him to let her into the car. Jones looked at Benjamie with "a sick smile on his face," that looked "like one of anger" and then drove down the street. Benjamie was screaming at Jones to stop, but Jones continued to drive away, holding Wolfgang on his lap. After determining that Jones had not gone to his mother's house, Benjamie called 911.

At 8:40 that night, Jones entered the Quik Korner market in Santee. He bought beer and chips, and put these items into the bottom compartment of a baby stroller. Later that night about 11:45, a police officer was assisting a motorist near the Quik Korner market and heard a loud yell coming from a nearby undeveloped area with very thick brush. The officer saw a stroller on the side of the brush next to an open field. Jones's shovel was sticking out from the stroller's top section.

Jones then walked from a foot path near the middle of the brush. Jones appeared nervous and smelled like an alcoholic beverage. Jones gave inconsistent explanations for what he was doing there. After searching and failing to find evidence of illegal conduct, the officers allowed Jones to leave the area.

Several hours later, about 3:00 a.m., Benjamie called Jones's apartment and left a message. Two or three minutes later, Jones called back and said: "How does it feel to have the shoe on the other foot . . . [y]our dad gets what he deserves. . . . [y]ou are never going to see your son again. He has a new mommy now. I will let you hear his voice over time but you will never see him again." When Benjamie told Jones he would be in trouble, Jones responded "[o]h, it is worth it."

Two days later, police officers returned to the field where the officers had seen Jones and conducted a more extensive search. They eventually found Wolfgang buried in a shallow grave. Several items associated with Jones were found near the grave, including a paper towel with Jones's blood on it and the food and beverage items he had purchased the previous night.

Dr. Harry Bonnell performed an autopsy on Wolfgang's body. There was no evidence of disease, bruising, scraping or cutting. There were pinpoint hemorrhages on the surface of the lungs which is consistent with obstruction of the mouth and nose. Dr. Bonnell opined the cause of death was asphyxia due to upper airway obstruction, and the obstruction would have caused death after 30 to 45 seconds. The autopsy revealed that Wolfgang was dead at the time he was buried. There were no marks on Wolfgang's face or throat. There was no evidence of external trauma or of shaken baby syndrome.

At trial, the prosecution's theory was that Jones intentionally killed Wolfgang by suffocating him as revenge against Mr. Winfree and Benjamie. The jury was instructed on two theories of first degree murder: (1) premeditation and deliberation; and (2) felony murder based on murder committed during a kidnapping. In defense, Jones did not present any affirmative evidence, and his counsel never disputed that Jones was the person who killed Wolfgang. Instead, Jones's counsel argued the jury should find Jones was not guilty of the charged crimes because it was not "impossible" to believe that Jones, who had been drinking alcohol, "passed out and somehow smothered this baby" and that Jones may have been so "frightened and embarrassed" by the way the baby accidentally died that he decided to bury the baby in a dirt field.

The jury ultimately found Jones guilty of first degree murder, kidnapping in violation of section 207, subdivision (a), assault on a child with force likely to produce great bodily injury, and found true the special circumstance that Jones committed murder during the course of a kidnapping. The jury verdict did not specify whether the first degree murder conviction was based on a felony-murder theory or a premeditated murder theory.

DISCUSSION

I. *Summary of Applicable Kidnapping Law*

Each of Jones's appellate arguments pertain to the kidnapping conviction. We thus begin with a brief overview of the law of kidnapping, particularly as it relates to an infant or child victim.

■ Generally, to prove the crime of kidnapping, the prosecution must prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance. (§ 207, subd. (a).)[2] California courts have recognized, however, that the first two elements raise an analytical problem when the victim is an infant or a very young child because this victim would be incapable of giving consent and can be unlawfully moved without resort to physical force or fear. (See *In re Michele D.* (2002) 29 Cal.4th 600, 607 [128 Cal.Rptr.2d 92, 59 P.3d 164]; *People v. Hill* (2000) 23 Cal.4th 853, 855 [98 Cal.Rptr.2d 254, 3 P.3d 898]; *People v. Oliver* (1961) 55 Cal.2d 761, 764-765 [12 Cal.Rptr. 865, 361 P.2d 593].) But these courts have also recognized that to eliminate the lack-of-consent and force elements would potentially permit a kidnapping conviction of an adult who forcibly transports a child for a good or innocuous purpose, which would be inconsistent with legislative intent in enacting the kidnapping statute. (*Ibid.*)

To resolve this conceptual problem, the California Supreme Court more than 40 years ago created an additional "intent" element applicable to the kidnapping of infants or very young children to substitute for the lack-of-consent element. (See *People v. Oliver, supra,* 55 Cal.2d at pp. 766-768.) Although the defendant's purpose or motive is generally not an element of a kidnapping crime, the *Oliver* court held that as to minors or others incapable of giving consent a person is guilty of kidnapping under section 207 "*only if the taking and carrying away is done for an illegal purpose or with an illegal intent.*" (*Oliver,* at p. 768, italics added; see *People v. Hill, supra,* 23 Cal.4th at pp. 856-857.) This additional element precludes a kidnapping conviction against a person who forcibly, but with lawful intentions, moves a child. (*In re Michele D., supra,* 29 Cal.4th at p. 611; see *People v. Ojeda-Parra* (1992) 7 Cal.App.4th 46, 50 [8 Cal.Rptr.2d 634].)

The Supreme Court recently reconfirmed that it is the prosecution's burden to prove this illegal purpose element in place of the lack-of-consent *and* force factors, and that "the amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance *for an illegal purpose or with an illegal intent.*" (*In re Michele D., supra,* 29 Cal.4th at pp. 606-610, italics added.) Further, it has been recognized that where the prosecution proves this unlawful purpose element, a parent who has rightful custody of

---

[2]Section 207, subdivision (a) provides: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

his or her child may be convicted of kidnapping the child. (*People v. Senior* (1992) 3 Cal.App.4th 765, 781 [5 Cal.Rptr.2d 14].) The *Senior* court explained that although generally "a parent entitled to custody cannot be liable for kidnapping . . . , we are persuaded that such a parent is liable for kidnapping if he or she exercises custodial rights for an illegal purpose." (*Ibid.*)

Mindful of these legal principles, we examine Jones's four separate challenges to the kidnapping conviction.

## II. *Preemption*

 Jones first contends his kidnapping conviction under section 207, subdivision (a) must be reversed because this crime is preempted by the child abduction law (§ 278) when a noncustodial parent abducts his own infant child. Section 278 states: "Every person, not having a right to custody, who maliciously takes, entices away, keeps, withholds or conceals any child with the intent to detain or conceal that child from a lawful custodian shall be punished . . . ."

 The preemption doctrine provides that a prosecution under a general criminal statute with a greater punishment is prohibited if the Legislature enacted a specific statute covering the same conduct and intended that the specific statute would apply exclusively to the charged conduct. (See *People v. Watson* (1981) 30 Cal.3d 290, 295 [179 Cal.Rptr. 43, 637 P.2d 279]; *In re Ricardo A.* (1995) 32 Cal.App.4th 1190, 1193 [38 Cal.Rptr.2d 586].) To determine the applicability of this doctrine in a particular case, the courts have developed two alternative tests. Under these tests, a prosecution under the general statute is prohibited if: (1) "each element of the general statute corresponds to an element on the face of the [specific] statute"; or (2) "it appears from the statutory context that a violation of the [specific] statute will necessarily or commonly result in a violation of the general statute." (*People v. Watson, supra,* 30 Cal.3d at pp. 295-296; see *People v. Coronado* (1995) 12 Cal.4th 145, 153-154 [48 Cal.Rptr.2d 77, 906 P.2d 1232].)

 Neither of these tests are met in this case. First, the two crimes have different elements even when the victim is an infant. Regardless of the age or mental capacity of the victim, kidnapping requires the element of asportation (physically moving the victim) (see *People v. Martinez* (1999) 20 Cal.4th 225, 235-237 [83 Cal.Rptr.2d 533, 973 P.2d 512]), whereas child abduction does not. (Compare § 207 with § 278.) Further, although the perpetrator's intent in a child abduction crime must be to detain or conceal the child from a person who has lawful custody, a kidnapping may be proven

by the showing of any illegal purpose or intent on the part of the defendant. (See *In re Michele D., supra,* 29 Cal.4th at p. 612; *People v. Oliver, supra,* 55 Cal.2d at p. 768.) With respect to the second test, a violation of the child abduction statute by a noncustodial parent will not necessarily result in a violation of the kidnapping statute. A noncustodial parent, for example, may violate the child abduction statute without committing a kidnapping by precluding the other parent's access to a child during the noncustodial parent's lawful visitation. This conduct would potentially violate section 278 even if the child is never unlawfully moved in violation of the kidnapping statute.

We also conclude the preemption doctrine is inapplicable for a more fundamental reason: it is clear from the different purposes of the two criminal statutes the Legislature did not intend the child abduction law would preclude the application of the kidnapping statute. (See *People v. Jenkins* (1980) 28 Cal.3d 494, 505 [170 Cal.Rptr. 1, 620 P.2d 587] [preemption issue is primarily a question of legislative intent].) In *In re Michele D.,* the California Supreme Court explained that "[t]here is a fundamental difference between kidnapping and child abduction in terms of the person targeted by the offense; the first is a crime against the person being kidnapped, the second against the parents of the child abducted. *If there is evidence that a defendant's conduct is aimed at both, there is no reason why he or she should not be prosecuted under both statutes.* To hold otherwise would be to devalue the dignity and bodily integrity of child victims." (*In re Michele D., supra,* 29 Cal.4th at p. 614, italics added, fn. omitted.)[3]

Although the defendant in *In re Michele D.* did not raise the specific preemption issue being asserted here, the court's discussion of the different purposes of the criminal statutes is dispositive of Jones's argument in this case. Where a Legislature enacts two statutes, each for a separate purpose and to protect different classes of victims, the Legislature does not necessarily intend the more specific statute to apply to the exclusion of the more general statute. To do so in this case would be to defeat the legislative intent underlying the kidnapping law, which is to protect the individual unlawfully moved by the defendant for an improper purpose. If we were to hold Jones could not be convicted of kidnapping, we would be devaluing the dignity and bodily integrity of Wolfgang who is within the class of persons the Legislature specifically sought to protect by enacting the kidnapping statute. (See *In re Michele D., supra,* 29 Cal.4th at p. 614.) The fact that the Legislature also enacted a law to protect Wolfgang's mother does not negate

---

[3]The *In re Michele D.* court did not ultimately reach the issue of the propriety of charging kidnapping and child abduction based on the same conduct because only kidnapping was charged in that case. (*In re Michele D., supra,* 29 Cal.4th at p. 614.)

the Legislature's intent to apply the kidnapping statute under the circumstances of the case.

Jones urges this court not to rely on *In re Michele D.* in deciding the preemption issue because in that case it was a teenage girl who abducted the young child, whereas here the defendant was the father of the abducted infant. However, the Supreme Court's explanation of the fundamental difference between kidnapping and child abduction in terms of the person targeted by the offense applies regardless of the relationship between the defendant and the victim. Although *In re Michele D.* can be factually distinguished from this case, this distinction is of no legal significance for purposes of considering Jones's contention that the kidnapping statute is preempted here.

We conclude the kidnapping statute was not preempted by the child abduction law under the circumstances of this case.

### III. *Illegal Purpose or Intent Element of Kidnapping*

 Jones next contends the court erred in instructing the jury on the "illegal intent or purpose" element of kidnapping.

The trial court instructed the jury that one of the elements of the kidnapping offense is that the "movement of the other person was without his consent . . . ," but "[i]f the person moved is incapable of consenting thereto by reason of immaturity or mental condition, then the person moving that person is guilty of kidnapping only if the act was done *for the purpose of child abduction or for the purpose of murder after moving.*" (Italics added.)

As discussed above, this "illegal purpose or intent" instruction was required under the facts of this case. (See *In re Michele D., supra,* 29 Cal.4th at p. 611; *People v. Oliver, supra,* 55 Cal.2d at p. 768; *People v. Ojeda-Parra, supra,* 7 Cal.App.4th at p. 50.) Jones nonetheless contends this specific instruction should not have been given because it informed the jury that the illegal purpose element could be met by a showing he moved Wolfgang for the purpose of abducting him in violation of the child abduction law. Jones maintains that "[t]o hold that the taking of a child for the purpose of a child abduction is kidnapping defeats the statutory distinction the Legislature has drawn between the offenses of kidnapping and child abduction. Such a result would improperly bootstrap the crime of child abduction into kidnapping in cases in which both the act and criminal purpose amount only to child abduction."

This argument is unsupported by any legal authority, and is inconsistent with the function of the "illegal purpose or intent" element. As we explained

above, this element was created by our Supreme Court to ensure that an innocent carrying away of a very young victim would not result in a kidnapping conviction. (See *In re Michele D., supra,* 29 Cal.4th at p. 612.) This problem is avoided if the prosecution proves the purpose of the asportation of the victim was to detain or conceal the child from the lawful custodial parent. By showing this illegal intent, the prosecution has met its burden to show the carrying away was not for a proper or innocent purpose, and therefore the Legislature would have intended the statute to apply under the circumstances.

The fact that child abduction is similar to the kidnapping crime does not undermine the logic of this chain of reasoning. Although in other areas of criminal law, the prosecution may not rely on one crime to establish the predicate for another similar crime (see, e.g., *People v. Ireland* (1969) 70 Cal.2d 522, 538-539 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]), this concept has no applicability here where the other crime's function is merely to eliminate the possibility of convicting an individual for moving a child with a "proper" purpose. Moreover, as we explained in rejecting Jones's preemption argument, kidnapping and child abduction are two separate crimes directed at protecting two different classes of victims. Thus, there is no legal impediment to holding that a noncustodial parent may be convicted of kidnapping if the intent and purpose of the movement is to illegally separate the child from the parent who has lawful custody.

*People v. Campos* (1982) 131 Cal.App.3d 894 [182 Cal.Rptr. 698] reached the identical conclusion in response to a similar argument made by the defendant. In *Campos,* the defendant was convicted of kidnapping after she took an 11-month-old boy from the mother's custody, transported him to Mexico, and then abandoned the child. (*Id.* at p. 897.) The jury was instructed that the defendant could be found guilty of kidnapping only if she moved the child for "the purpose of 'concealing the child.' " (*Id.* at p. 898.) On appeal, the defendant argued that "if her intent to conceal the child, an element of the charge of violating Penal Code section 278, is the same intent which renders the moving of the child unlawful, then there is no separate crime of kidnapping." (*Ibid.*) The *Campos* court rejected this argument, explaining that the Supreme Court created the intent element to avoid a conviction "where a child is moved for a good or innocent purpose. Here, of course, the evidence amply supports the conclusion that appellant took the child for base antisocial purposes, not for a good or innocent reason. Such a taking is kidnapping . . . ." (*Id.* at p. 899.)

Jones argues *Campos* is inapplicable here because the *Campos* court qualified its holding by noting that the "case does not involve a custody

battle between parents. It involves a heinous crime in which for base, vengeful reasons an outsider has stolen a baby from its mother, the baby never to be found again, and at best, abandoned in a foreign country." (*People v. Campos, supra,* 131 Cal.App.3d at p. 899.)

These remarks do not reflect that the *Campos* court was limiting its holding to defendants who were unrelated to the child. First, as in *Campos,* this case similarly did not involve a custody dispute. Jones never sought custody of Wolfgang, and Jones had no arguable right to custody when he drove off with Wolfgang in his car. More significant, the *Campos* court made these statements about the aggravated nature of the defendant's acts to underscore its conclusion that the prosecution's decision to charge both kidnapping and child abduction reflected "permissible prosecutorial discretion . . . ." (*People v. Campos, supra,* 131 Cal.App.3d at p. 899.) The prosecution's decision to charge this case as a kidnapping was similarly a proper exercise of discretion. The evidence showed Jones had particularly evil and despicable motives for taking his child—to take the life of a baby merely to get "revenge" against the baby's mother and grandfather for the mother's decision not to marry Jones. *Campos*'s remarks that the crime in that case was particularly "heinous" apply equally to the circumstances here.

### IV. *Specific Intent*

 Jones next contends the court committed instructional error by permitting the jury to infer it could find Jones guilty of first degree murder on a felony-murder theory without finding Jones had the specific intent to kidnap Wolfgang.

 To establish first degree murder based on a felony-murder theory, the prosecution has the burden of proving the defendant harbored the specific intent to commit the underlying felony. (See *People v. Hart* (1999) 20 Cal.4th 546, 608 [85 Cal.Rptr.2d 132, 976 P.2d 683]; *People v. Jones* (2000) 82 Cal.App.4th 663, 667 [98 Cal.Rptr.2d 724].) In this case, the jury was properly instructed that to find Jones guilty of first degree felony-murder during kidnapping, the prosecution was required to prove beyond a reasonable doubt that Jones had the "specific intent to commit kidnapping."

Jones nonetheless contends the jury may have disregarded this instruction because the jury was additionally instructed on the "illegal purpose or intent" element of a kidnapping offense. This challenged instruction stated: "If the person moved is incapable of consenting thereto by reason of immaturity or mental condition, then the person moving that person is guilty

of kidnapping only if the act was done for the purpose of child abduction or for the purpose of murder after moving."

Reasonably read, the jury would not have interpreted this instruction to mean that it was entitled to disregard the specific intent instruction on the felony-murder kidnapping charge. The illegal purpose instruction concerned an additional element that must be proved because Wolfgang was an infant. Reviewing the entire jury charge, a reasonable juror would not have read this instruction as negating the earlier specific intent instruction.

The jury was properly instructed that the People had the burden to show Jones's specific intent to kidnap Wolfgang.

### V., VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Judgment affirmed. The trial court is directed to amend the abstract of judgment to reflect the court sentence to life in state prison without the possibility of parole. The trial court is further directed to forward a copy of the amended abstract of judgment to the Department of Corrections. The judgment, as so modified, is affirmed.

Benke, Acting P. J., and McConnell, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 23, 2003. Brown, J., did not participate therein.

---

*See footnote, *ante*, page 455.