Filed 1/4/24  P. v. Cosso CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>              v.<br><br>JOHN CHRISTOPHER COSSO,<br><br>        Defendant and Appellant. | F084748<br><br>(Super. Ct. No. CR18006964)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ricardo Cordova, Judge.

Deanna L. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant John Christopher Cosso was convicted of kidnapping, burglary, domestic violence, and other misdemeanor offenses. Defendant contends: (1) there is insufficient evidence to support the conviction for kidnapping because defendant had a lawful right to custody of his son and the prosecution failed to prove he exercised his legal right with an unlawful intent; (2) the burglary conviction is based on an erroneous finding of kidnapping and thus must be reversed; and (3) the sentence for the domestic violence count must be stayed because the offense was committed as part of the same course of conduct to obtain defendant's son.

The People respond that substantial evidence supports the kidnapping conviction because defendant acted with illegal intent in taking his son. The People also contend defendant's forced entry into his ex-girlfriend's house constituted burglary because defendant entered the house with the felonious intent to kidnap his son. Lastly, the People argue defendant's sentence for the domestic violence count was not required to be stayed because the offense was committed against a different victim from the kidnapping victim.

We affirm.

## PROCEDURAL SUMMARY

On January 22, 2021, the Stanislaus County District Attorney filed an information charging defendant with: felony kidnapping of J.C.[1] (Pen. Code, § 207, subd. (a);[2] count I); first degree burglary (§ 459; count II); child abuse under circumstances likely to cause great bodily injury or death (§ 273a, subd. (a); count III); false imprisonment (§ 236; count IV); domestic violence against Kimberly V. (§ 273.5, subd. (a); count V); and misdemeanor vandalism (§ 594, subd. (a)(2); count VI). The information alleged that the burglary was committed while a nonaccomplice was present (§ 667.5, subd. (c)(21)).

---

[1] For purposes of clarity because defendant and his son share the same initials, J.C. hereinafter refers to defendant's son.

[2] All further statutory references are to the Penal Code unless otherwise stated.

2.

On June 17, 2022, the jury found defendant guilty on counts I, II, V and VI. The jury found defendant not guilty on counts III and IV, but guilty of the lesser included offenses of permitting a child, J.C., to suffer unjustifiable physical pain or mental suffering on count III (§ 273a, subd. (b)) and misdemeanor false imprisonment of Kimberly on count IV (§ 236), respectively. The jury also found true the allegation the burglary was committed while a nonaccomplice was present on count II.

On July 18, 2022, the trial court sentenced defendant to four years as follows: on count I, three years (the low term); on count II, two years (the low term), stayed pursuant to section 654; on count V, one year (one-third of the middle term) consecutive to the term on count I; and on counts III, IV and VI, 180 days for each count, to run concurrently.

Defendant filed a timely notice of appeal.

## FACTUAL SUMMARY

### I. Prosecution Evidence

Defendant and Kimberly began dating in 2011. Their relationship moved quickly, and they moved in together within months. They had one child, J.C., who was born in September 2012. Defendant and Kimberly's relationship was toxic with on and off periods during which they lived apart until their final split in July 2018. Defendant exhibited behavior Kimberly found bizarre. Kimberly's behavior was also erratic at times. Kimberly had a history of cutting herself and attempted to commit suicide in 2014.

There were numerous custody orders regarding J.C. between 2014 and 2018. After the relationship ended in July 2018,[3] defendant and Kimberly verbally agreed to informal shared custody of J.C. of three days with defendant and three days with Kimberly. Kimberly has three other children, Devin (age 20), Jaron (age 17), and Max

---

[3] All further dates refer to 2018 except as otherwise noted.

3.

(age 10), with another man.[4]  Defendant also has another son, Dominic, who was 17 years old at the time of the offenses.

In September, there were no custody orders in effect regarding J.C.  On September 14, defendant text messaged Kimberly, asking to see J.C. that Monday, September 17.  Defendant and Kimberly met at J.C.'s school on September 17, and Kimberly took J.C. to defendant's house and left for work.  Defendant then sent text messages to Kimberly, asking her to come pick J.C. up from his house.  Kimberly left work and went to defendant's house to pick J.C. up, but J.C. told Kimberly he did not want to leave.  Kimberly told J.C. she was not going to take him and left.

J.C. did not go to kindergarten on September 18 or 19 but returned to school on September 20.  Defendant text messaged Kimberly to ask if he could keep J.C. through the weekend for defendant's birthday and Kimberly could pick J.C. up on September 24. Kimberly agreed to let defendant keep J.C. through the weekend.  Although defendant was supposed to pick J.C. up from school on September 20, Kimberly picked J.C. up that day without defendant's knowledge and stopped responding to defendant's messages.

On September 21, law enforcement visited Kimberly's house to conduct a well check on J.C. at defendant's request.  They checked on J.C. and left him with Kimberly. Defendant was informed that J.C. looked fine.  Defendant went to court that day to obtain paperwork to attempt to gain custody of J.C.

At approximately 7:30 a.m. on September 24, Kimberly was at her house in Modesto with her sister, Malisa A., and Kimberly's children, Devin, Jaron, Max, and J.C. Kimberly was in the kitchen with J.C. while J.C. was eating breakfast.  A man came to the screen door claiming to be from PG&E.  The screen door was shut but the "big door" was open.  The man told Kimberly he needed to see the gas meter and wanted to see if he could get to the meter in the backyard.  Malisa heard the man and told Kimberly to say

_____

**4**      These are the ages of Kimberly's other children at the time of defendant's offenses.

no, they will call the electrical company if there are any issues. Kimberly told the man she would call PG&E herself. The man started to walk away.

Kimberly started to walk back into the kitchen when she saw through the window that defendant's son Dominic's gold car was outside the house. Kimberly said to Malisa, "[C]all the cops. [Defendant] is here." Kimberly shut and bolt-locked the front door. Kimberly grabbed J.C. and ran with him to a corner of the house.

People began pounding on Kimberly's front door. The pounding woke up Devin and Jaron. Devin heard Malisa say, "They're here." Devin and Jaron ran to the front door. Malisa called 911 while she and Devin tried to barricade the door. Defendant and Dominic were at the door with a man and a woman. The woman pepper sprayed Malisa's face through a crack in the door. Jaron was also pepper sprayed in the face. Defendant, Dominic and their two cohorts forced their way into the house, breaking the door in the process.

Defendant went through the house calling for J.C. Kimberly grabbed her keys and ran to the garage with J.C. Kimberly got into the driver's seat of her car with J.C. She opened the garage and backed up her car to try to get away. Kimberly stopped her car because there were cars and people behind her.

Devin tackled defendant in the garage but let defendant go because Devin thought Kimberly had gotten away. Defendant grabbed a toolbox and broke Kimberly's car passenger-side window with it. He unlocked the car door and screamed at Dominic to "grab her arm." Jaron captured video of part of the encounter on his cell phone. Jaron tried to pull defendant out of Kimberly's car from the passenger side. Defendant grabbed one of Kimberly's arms while Dominic grabbed the other arm. J.C. was pulled from Kimberly's arms and out of the car through the driver-side door.

Kimberly jumped out of her car and ran to jump onto defendant. A woman pulled Kimberly off defendant and punched Kimberly in the head. Defendant put J.C. into a black sedan with an unidentified man and woman. Kimberly jumped into the backseat of

5.

the sedan and held on to the seats trying to get J.C. out of the car. Kimberly was pulled out of the sedan multiple times. Kimberly grabbed on to the sedan's back door. Defendant was hanging on to Kimberly trying to rip her off the sedan. J.C. was crying and screaming, "No, daddy. I'm not your best friend, daddy. I'm not going to go with you, daddy. No, daddy. I'm not your best friend." Defendant pulled Kimberly off the sedan, and it sped away. Devin ran alongside the sedan and tried to get inside but was prevented from doing so by a person inside the vehicle. Devin fell as he was running alongside the sedan. Defendant and Dominic got into Dominic's car and followed the sedan.

Kimberly sustained bruises on both arms and scrapes on her feet from the encounter. She also had pain in her head from the female's punch.

Modesto Police Detective Gary Guffey was dispatched to Kimberly's house. While enroute, Guffey was advised that Dominic's car had been seen in a parking lot. The car was parked and unoccupied. Guffey and another detective conducted surveillance on Dominic's car from an unmarked police vehicle. After close to an hour, Guffey left the parking lot and went to Kimberly's house.

An Amber alert[5] was issued for J.C. In response to the alert, an individual contacted the police and reported seeing defendant, Dominic, and J.C. at a store in Tracy. The store's video surveillance showed the three walking around the store, buying items and then walking to a silver vehicle in the parking lot.

The Modesto Police had been pinging phones[6] associated with defendant and Dominic since about 7:30 a.m. Defendant's and Dominic's phones pinged at the same location at a hotel in Dublin, California. Guffey and other detectives responded to the

---

[5]     An "Amber alert" is a notification to the public with information about an abduction asking for the public's help to locate a missing person.

[6]     "Pinging" gives a cell phone's GPS location based on the phone's signal to cell phone towers.

hotel.  Guffey observed a silver vehicle in the hotel's parking lot like the one defendant and Dominic were seen walking to in the store parking lot video.  The silver vehicle was registered to defendant's daughter.  Defendant's sister had booked a room at the hotel for defendant under her name.

At approximately 7:00 a.m. on September 25, defendant was arrested at the hotel.  The Modesto Police conducted a search of defendant's hotel room pursuant to a warrant.  Tattoo coverup[7] and more than $2,800 in cash were found in the room.  There were also various documents in the room, including birth certificates for defendant and J.C., defendant's social security card, a vehicle title, and medical documents.  Defendant had also bought two new phones.  Pepper spray packaging was separately discovered during a search of defendant's residence.

Dominic was also arrested.  Dominic told the Modesto Police that he and defendant had visited a donut shop on the morning of September 24.  Video surveillance from the donut shop showed defendant and Dominic meeting with a man and two women in the shop at about 7:00 a.m. on that date.  The group left the donut shop together at about 7:14 a.m.

Guffey and another detective, Ra Pouv, took defendant's statement at the hotel after he was arrested and *Mirandized*.[8]  Defendant was emotional during the interview and admitted taking J.C.  Defendant identified his son, Dominic, and a friend, Renee, among the people with him when he took J.C., but defendant claimed not to know the other two people who participated.  Renee had vouched for those two people.  Defendant provided pepper spray to one of the women because he was concerned individuals at the house would prevent them from accomplishing what he wanted to do.  Renee had worked out the plan for one person to make contact at Kimberly's house in a utility-worker shirt.

---

[7]     Defendant testified that tattoo coverup is makeup he sometimes used to cover up his facial tattoos.

[8]     See *Miranda v. Arizona* (1966) 384 U.S. 436.

7.

Defendant regretted that the people he was with had been so aggressive. Defendant said it was "fucked up" what he did and that it was not "the right way."

The black sedan used to take J.C. was discovered abandoned with the engine running in Modesto on October 1. The car was registered to Renee Quijada Larson. A bag from the donut shop that defendant and his cohorts visited on September 24 with a partially eaten donut was found in the sedan. The sedan had damage to the driver's rear mirror. There were smudge marks on the sedan's exterior, indicating efforts to remove or disguise fingerprints.

## II. Defense Evidence

Defendant testified about his relationship with Kimberly. He saw Kimberly engage in irrational behavior while they were together. Defendant saw Kimberly cutting herself with a razor blade in the bathroom. Another time, Kimberly was upset and repeatedly hit her head against the bedroom wall, creating several holes in the wall. Approximately two months before her 2014 suicide attempt, Kimberly ran through the house yelling, "I'm going to fucking kill myself." A month or a couple of months later, defendant returned to the house to find Kimberly unresponsive on their bed. Defendant called 911 and discovered an empty bottle of Xanax pills. Kimberly was away for about two to three weeks after the suicide attempt, during which time defendant took care of J.C.

Shortly after the suicide attempt, defendant and Kimberly arranged for her to come over to see J.C. When Kimberly came over, the pair disagreed about whether Kimberly could keep J.C. overnight. Because they could not agree, defendant took J.C. out of Kimberly's car and walked back to his house. Kimberly chased after defendant. Defendant told Kimberly not to come into the house and closed the door behind him. Kimberly pushed the door open, came inside, and then slapped, punched, and pushed defendant while he was holding J.C.

In 2015, Kimberly was driving with defendant in a new car when they got into an argument. Kimberly began speeding through the streets without stopping at red lights or stop signs.

In 2016, defendant called a family meeting with Dominic, Devin, and Jaron. Defendant wanted to talk to Devin and Jaron about their use of marijuana, and to Devin about not responding on his phone. Kimberly did not want to participate in the meeting and told defendant he could talk to the boys. At the meeting, defendant told Devin and Jaron to put their phones on the floor, and they refused. Defendant tried to reach into Devin's pocket for his phone. Devin jerked and said, "Don't fucking touch me." Defendant at one point said to Jaron something to the effect of, "Don't do it. I'll fuck you up."

Later that evening, defendant was with J.C. in the living room when five people, including Kimberly and her sisters, Vanessa and Ciara, entered the house and forcibly took J.C. Defendant called the police but was told the taking was legal because there was no custody order in place.

The family meeting incident led to supervised visitations for defendant with J.C. In 2017, defendant and Kimberly rekindled their relationship. They jointly agreed to ask the court to drop the custody orders. After that, there were no custody orders in effect. In early 2018, defendant and Kimberly purchased a house together. They moved in with all the children. Defendant and Kimberly's relationship was tumultuous after they moved into the house. Kimberly drank alcohol almost every day and used a marijuana vape pen.

In June, the police showed up at defendant and Kimberly's house on numerous occasions due to noise. Defendant suggested to Kimberly that Devin get his own place. Defendant and Kimberly's relationship ended shortly after that, at the end of June. Kimberly moved out of the house, but her children initially stayed, except for Max. In July or August, defendant and Kimberly reached the informal agreement to shared custody of J.C. of three days with each parent.

9.

Defendant did not see J.C. for part of September. On September 17, defendant and Kimberly met at J.C.'s school and Kimberly drove J.C. to defendant's house. The initial plan was for J.C. to stay with defendant for the next three days. Defendant asked Kimberly if he could keep J.C. through the weekend instead of returning J.C. on Thursday. Kimberly initially disagreed but then relented and said that defendant could keep J.C. through the weekend. On Thursday morning, defendant dropped J.C. off at his school. When defendant went back to the school a few hours later to pick J.C. up, J.C. was not there. A teacher told defendant that Kimberly had picked J.C. up about 30 minutes after defendant dropped him off. Defendant reached out to Kimberly but received no response. He also reached out to members of Kimberly's family but received no helpful responses. Defendant learned that J.C. did not return to school on Friday.

Defendant admitted he went to Kimberly's house and took J.C. on September 24. Defendant testified he took J.C. because he was concerned about J.C.'s safety due to Kimberly's past. Defendant bought pepper spray the evening before in case Kimberly's family "put up a big fight." Defendant contacted Renee who said she had people who could help take J.C. Defendant and Renee arranged to meet with the others and Dominic at the donut shop beforehand. Defendant provided the pepper spray to these people. The plan was for one man to gain entry to Kimberly's house by posing as a PG&E worker and text message defendant if J.C. was in the house. Defendant would then walk into the house and leave with J.C.

After learning the PG&E ploy was unsuccessful, defendant walked toward Kimberly's door. He heard Kimberly say "motherfucker" from her house window. Defendant began hitting the house door with his shoulder while one of his male cohorts was kicking it. Once defendant got inside the house, he looked in every room and every closet, calling out for J.C. Defendant went to the garage where Devin initially tried to prevent him from getting in.

Kimberly was holding J.C. in her car in the garage.  Defendant knocked on the car window, but Kimberly did not open the door.  Defendant used a toolbox to make a hole in the passenger-side window and reached in to unlock the car.  Defendant pulled Kimberly's arms off J.C. and then put J.C. in the black sedan.

Defendant initially planned to take J.C. to his father's house.  The plan changed when defendant began getting notifications on his phone, including the Amber alert.  Defendant called his father who told him that investigators had come by.  Defendant was tired and found a hotel room in Dublin.  He planned to return to Modesto the next day to "drop the boys off" because "it was the right thing to do."  Defendant was arrested the next day.

## DISCUSSION

### I.    Sufficiency of the Evidence for Kidnapping and Burglary

Defendant contends there is not substantial evidence to support the kidnapping conviction because he had the lawful right to custody of J.C. and the prosecution failed to show he exercised his legal right for an illegal purpose.  In a related argument, defendant contends the burglary conviction must be reversed because it was based on an erroneous finding he committed kidnapping.

### A.    *Standard of Review*

"To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even

11.

testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.  [Citation.]'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, fourth, fifth, & sixth bracketed insertions in original; see *People v. Johnson* (1980) 26 Cal.3d 557, 562; *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320.)

"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence."  (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.)  "Whether the evidence presented at trial is direct or circumstantial, … the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt."  (*People v. Towler* (1982) 31 Cal.3d 105, 118.)  "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal."  (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 358.)

**B.** **Kidnapping of a Child**

"Generally, to prove the crime of kidnapping, the prosecution must prove three elements:  (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.  [Citation.]  California courts have recognized, however, that the first two elements raise an analytical problem when the victim is an infant or a very young child because this victim would be incapable of giving consent and can be unlawfully moved without resort to physical force or fear."  (*People v. Jones* (2003)

108 Cal.App.4th 455, 462, fn. omitted.) "To resolve this conceptual problem, the California Supreme Court more than 40 years ago created an additional 'intent' element applicable to the kidnapping of infants or very young children to substitute for the lack-of-consent element. [Citation.] Although the defendant's purpose or motive is generally not an element of a kidnapping crime, the [California Supreme Court] held that as to minors or others incapable of giving consent a person is guilty of kidnapping under section 207 '*only if the taking and carrying away is done for an illegal purpose or with an illegal intent.*' " (*Ibid*.; see *People v. Oliver* (1961) 55 Cal.2d 761, 768; § 207, subd. (a).) This intent element was codified in section 207, subdivision (e), which clarified that "the amount of force required to kidnap an unresisting infant or child is the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (§ 207, subd. (e); see *In re Michele D.* (2002) 29 Cal.4th 600, 609.) "[I]t is the prosecution's burden to prove this illegal purpose element in place of the lack-of-consent *and* force factors." (*Jones*, at p. 462.)[9]

This illegal purpose concept applies equally where a parent is charged with kidnapping his or her own child. It has long been held that " '[i]n the absence of an order or decree affecting the custody of a child, it is generally held that a parent … does not commit the crime of kidnapping by taking exclusive possession of the child.' " (*Wilborn v. Superior Court* (1959) 51 Cal.2d 828, 830.) In the absence of a court custody order, a parent's exercise of exclusive possession of the child *alone* does not constitute kidnapping. "[W]hile a father entitled to custody ordinarily cannot kidnap his own child,

---

[9]     The jury was correctly instructed on the elements of kidnapping pursuant to CALCRIM No. 1215: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] One, the defendant took, held, or detained another person by force or by instilling reasonable fear. [¶] Two, using that force or fear, the defendant moved the other person or made the other person move a substantial distance. [¶] Three, the other person did not consent to the movement. [¶] Four, the defendant did not actually and reasonably believe that the person consented to the movement. [¶] And, five, the defendant moved the child with an illegal intent or for an illegal purpose."

his right to physical custody ends when he exercises it for a purpose known to be illegal." (*People v. Senior* (1992) 3 Cal.App.4th 765, 781.) "[W]here the prosecution proves this unlawful purpose element, a parent who has rightful custody of his or her child may be convicted of kidnapping the child." (*People v. Jones*, *supra*, 108 Cal.App.4th at pp. 462–463.) Thus, while the "general rule is that a parent entitled to custody cannot be liable for kidnapping his or her own child," "a parent is liable for kidnapping if he or she exercises custodial rights for an illegal purpose." (*Senior*, at p. 781.)

Defendant relies on *Cline v. Superior Court* (1982) 135 Cal.App.3d 943 (*Cline*) to argue he was entitled to exercise exclusive right to custody of J.C. because there was no custody order in effect when he took J.C., and his coequal right to custody defeats the kidnapping allegation. In *Cline*, the defendant and his ex-wife lived together in Indiana and had a son. (*Id.* at p. 945.) The ex-wife took the former couple's two-year-old son to California and informed the defendant of their whereabouts. (*Id.* at pp. 945–946.) The defendant obtained a temporary custody order from an Indiana court and then went to visit his son in California. (*Id.* at p. 946.) During the visit, the defendant tried to forcibly take the child but was thwarted by the ex-wife who alerted a nearby police car. (*Ibid.*) The defendant was charged with child stealing (former § 278)[10] and kidnapping (§ 207). (*Cline*, at p. 945.) The Court of Appeal concluded, "[T]he California Supreme Court has made clear that in the absence of an order or decree affecting custody, a parent does not commit child stealing by taking exclusive possession of the child." (*Id.* at p. 947.) The court further held the defendant could not be charged with kidnapping because the defendant's "coequal right to custody defeats any allegation of kidnaping by providing a legal purpose and intent." (*Id.* at p. 948.)

Preliminarily, the facts in *Cline* are distinguishable because the defendant in *Cline*

---

**10**     Section 278 currently provides that "[e]very person, not having a right to custody, who maliciously takes, entices away, keeps, withholds, or conceals any child with the intent to detain or conceal that child from a lawful custodian" is guilty of child abduction or stealing.

14.

had "the only arguably valid custody order" of the defendant's child at the time of the alleged offenses. (*Cline*, *supra*, 135 Cal.App.3d at p. 945.) Here, neither parent had a custody order regarding J.C. We agree with defendant though, that in the absence of a court order, both parents are equally entitled to custody of a child (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1314).

The " 'right to custody' means the right to the physical care, custody, and control of a child pursuant to a custody order … or, *in the absence of a court order, by operation of law*." (§ 277, subd. (e), italics added.) Family Code section 3010, subdivision (a) provides that a mother and presumed father "are equally entitled to the custody of the child."[11] "[A]bsent a custody order a presumed father … retains the right to physical custody of his child unless it is relinquished by the means identified in the governing statutes: death, inability or refusal to take custody, or abandonment of the child." (*People v. Ryan*, *supra*, 76 Cal.App.4th at p. 1314; see § 277, subd. (f).) Because there was no court custody order or relinquishment of his right to custody, defendant had an equal right to custody of J.C. as J.C.'s presumed father.[12]

Nevertheless, as previously discussed, a parent with the right to custody of a child may still be convicted of kidnapping where the parent "exercises custodial rights for an illegal purpose." (*People v. Senior*, *supra*, 3 Cal.App.4th at p. 781.) Defendant argues that even assuming his intent was to commit child concealment from another parent in violation of section 278, the statute only applies where a noncustodial parent takes a child from "the legally-decreed custodial parent."

---

[11] In support of his coequal right to custody of J.C., defendant erroneously cites former Civil Code section 197, which was repealed in 1994. (Stats. 1992, ch. 162, § 2.) We agree, though, that defendant had a coequal right to custody of J.C. pursuant to the current authorities discussed herein.

[12] Defendant is J.C.'s presumed father because he received J.C. into his home and openly held J.C. out as his son. (See Fam. Code, § 7611, subd. (d); *People v. Johnson* (1984) 151 Cal.App.3d 1021, 1025.) The parties do not dispute defendant is J.C.'s father.

15.

Section 278 criminalizes child stealing by a person "not having a right to custody." In *Cline*, as in this case, the defendant could not have violated section 278 because he had the right to custody of his child. (*Cline*, *supra*, 135 Cal.App.3d at p. 947; see also *People v. Johnson*, *supra*, 151 Cal.App.3d at p. 1026.) The court in *Cline* expressed "abhorrence" for the parents' conduct toward their son, but rejected the People's argument that the court must "fill gaps left by the Legislature" in failing to criminalize the defendant's reprehensible conduct. (*Cline*, at pp. 946, 947.)

Section 278.5 fills that legislative gap by criminalizing child custody deprivation as follows: "Every person who takes, entices away, keeps, withholds, or conceals a child and maliciously deprives a lawful custodian of a right to custody, or a person of a right to visitation, shall be punished by imprisonment in a county jail not exceeding one year, a fine not exceeding one thousand dollars ($1,000), or both that fine and imprisonment, or by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months, or two or three years, a fine not exceeding ten thousand dollars ($10,000), or both that fine and imprisonment." (§ 278.5, subd. (a).) Unlike section 278, section 278.5 contains no requirement the perpetrator does not have a right to custody. Section 278.5 applies to "[e]very person," including a parent with a right to custody, who takes a child with the intent to deprive a lawful custodian of a right to custody or visitation.[13] (See, e.g., *People v. Jo* (2017) 15 Cal.App.5th 1128 [upholding defendant mother's conviction under § 278.5 for maliciously depriving defendant's child's father of custody or visitation].) By its plain language, section 278.5 prohibits child custody deprivation whether or not a custody order is in place. The defendant acts "maliciously" under section 278.5 where the defendant wishes to vex, annoy, or injure another person, or has the intent to do a

---

[13]     A "[l]awful custodian" includes a person "having a right to custody of a child." (§ 277, subd. (d).)

wrongful act. (*People v. Neidinger* (2006) 40 Cal.4th 67, 79; § 7, subd. (4).) A father who takes his own child from its mother may therefore violate the statute.

Viewing the evidence in the light most favorable to the judgment, a rational juror could have inferred defendant took J.C. with the illegal intent to deprive Kimberly of her coequal right to custody of J.C.[14] in violation of section 278.5. Defendant did not plan to take J.C. back to his own residence, but instead intended to take J.C. to defendant's father's house. After learning investigators had visited his father's house, defendant instead took J.C. to a hotel. If defendant planned to pursue a lawful right to custody of J.C. after the taking, he presumably would have taken J.C. to his own residence.[15] Fleeing to a hotel with a large amount of cash and buying new phones could reasonably have indicated to the jury that defendant wished to conceal his taking of J.C. from Kimberly and law enforcement. (*People v. Massie* (2006) 142 Cal.App.4th 365, 373–374 ["An inference is a logical and reasonable deduction or conclusion to be drawn from the proof of preliminary facts."].) The search of defendant's hotel room unearthed items and documents further suggesting defendant intended to flee with J.C. and permanently deprive Kimberly of her right to custody. Defendant had his social security card, both his and J.C.'s birth certificates, a car title, more than $2,800 in cash, and medical documents in the room. (See, e.g., Fam. Code, § 3048, subd. (b)(1) [factors for a court to consider in whether there is a risk of child abduction include liquidating assets or obtaining a birth

---

**14**     " 'Visitation' " is defined as "the time for access to the child allotted to any person by *court order*." (§ 277, subd. (h), italics added.) Because there was no court order in place, defendant could only deprive Kimberly of her right to custody, not visitation.

**15**     Section 278.7 provides a defense to child custody deprivation under certain circumstances: "Section 278.5 does not apply to a person with a right to custody of a child who, with a good faith and reasonable belief that the child, if left with the other person, will suffer immediate bodily injury or emotional harm, takes, entices away, keeps, withholds, or conceals that child." (§ 278.7, subd. (a).) Where a person takes a child pursuant to section 278.7, the person must report the taking to the district attorney and commence a custody proceeding "[w]ithin a reasonable time." (§ 278.7, subds. (c), (d); see *People v. Jo, supra*, 15 Cal.App.5th at p. 1159.)

certificate or medical records].)  The tattoo coverup found in the hotel room permitted an inference defendant plotted to conceal his identity by covering identifying markers like his facial tattoos.  Furthermore, the way defendant took J.C. reflects an intent to obtain and keep his son in an extralegal fashion.  Defendant and his accomplices forcefully entered Kimberly's house, damaging the front door, and pepper sprayed two people in the process.  Defendant and Dominic physically forced J.C. from his mother's arms. Defendant's conduct does not indicate a desire to peaceably share custody of J.C. with Kimberly but rather evinces an intent to vex, annoy or injure Kimberly by forcibly taking J.C. from her and preventing her from exercising her right to custody in the future.

Defendant suggests his taking of J.C. was not kidnapping because he did not take J.C. for the purposes of committing any crime against his child.  Defendant correctly notes that child abduction under section 278 is a crime against the parent, whereas kidnapping is a crime against the child.  (See *In re Michele D.*, *supra*, 29 Cal.4th at p. 614 [kidnapping is a crime against the child while child abduction is a crime against the parents of the abducted child].)  Child custody deprivation under section 278.5 is likewise a crime against a lawful custodian, not the child.  (See *In re Michele D.*, at p. 614.)

The defendant's unlawful intent need not be directed at the kidnapped victim to constitute kidnapping but may be directed toward others.  (*People v. Hill* (2000) 23 Cal.4th 853, 858 [carjacking of victim with her seven-month-old baby was kidnapping where unlawful intent was directed at the mother, not the baby]; *People v. Duran* (2001) 88 Cal.App.4th 1371, 1378–1379 [the prosecution is not required to show a defendant's illegal intent is specifically directed at the kidnapped person].)  Furthermore, the jury is not required to "find the defendant intended to commit any particular crime by moving the child."  (*Hill*, at p. 857, fn. 3.)  The defendant need only transport the child with "an evil and unlawful intent."  (*People v. Oliver*, *supra*, 55 Cal.2d at p. 765.)  As discussed above, there is substantial evidence to support a finding that defendant took J.C. with the

illegal intent to deprive Kimberly of her right to custody in violation of section 278.5.[16] We therefore reject defendant's contention there is not substantial evidence to support his kidnapping conviction.

## C. *Burglary*

Defendant does not specifically challenge the sufficiency of the evidence to support the burglary conviction but instead argues the burglary conviction must be reversed because the conviction was based upon an erroneous finding of kidnapping. Because we have rejected defendant's sufficiency of the evidence challenge to the kidnapping conviction, his challenge to the burglary conviction must also necessarily fail. In any event, there is overwhelming evidence to support defendant's burglary conviction.

First degree burglary occurs when a person enters an inhabited structure with the intent to commit larceny or a felony. (§§ 459, 460, subd. (a); *People v. Hendrix* (2022) 13 Cal.5th 933, 939.) The jury here was instructed: "You may not find the defendant guilty of burglary unless you all agree he intended to commit [kidnapping] at the time of entry." The evidence overwhelmingly shows that defendant entered Kimberly's house with the felonious intent to kidnap J.C. Defendant admitted taking J.C. and handing pepper spray to an individual to accomplish the group's purpose of taking J.C. After defendant and his cohorts forced entry into the house, defendant searched the house for J.C. while calling out J.C.'s name. J.C. was forcibly removed from Kimberly's arms in

---

**16** To the extent defendant contends his conduct would be excepted from section 278.5 because he took J.C. from Kimberly out of concern for J.C.'s safety (see § 278.7), the contention is without merit. Law enforcement conducted a well check on J.C. per defendant's request on September 21, and advised defendant that J.C. was fine just three days before defendant took J.C. While Kimberly's past behavior was troubling, there was no basis for defendant to believe J.C. would suffer immediate bodily injury or emotional harm if left with his mother. We further note the jury was instructed that a defendant is not guilty of kidnapping where the child is taken "to protect that child from danger of imminent harm." (CALCRIM No. 1225; see § 207, subd. (f)(1).) An "imminent harm" is defined as "an immediate and present threat of harm." (CALCRIM No. 1225.) The jury necessarily found J.C. was not in danger of imminent harm by its verdict on the kidnapping charge.

19.

the garage by defendant and Dominic. Defendant pulled Kimberly off the black sedan to facilitate J.C.'s removal from the scene. Defendant's kidnapping conviction was supported by substantial evidence, and there is no basis for reversal of the related burglary conviction.

## II. Sentence for Domestic Violence

Defendant contends that if there is substantial evidence to support the kidnapping conviction, his case should still be remanded for resentencing in accordance with section 654. Defendant argues the trial court erred by not staying the sentence on count V for domestic violence because defendant's assault on Kimberly was part of a single act with a single purpose to take J.C.

### A. *Applicable Law*

Effective January 1, 2022, section 654, subdivision (a) states: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." "[T]he purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability." (*People v. Correa* (2012) 54 Cal.4th 331, 341 (*Correa*).) "Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the [sentencing order] and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "[T]he applicability of [section 654] to conceded facts is a question of law." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) When the facts are undisputed, we review the trial court's application of section 654 de novo. (*People v. Corpening* (2016) 2 Cal.5th 307, 312.)

A defendant may not be punished more than once for a single physical act that accomplishes multiple crimes. (*People v. Corpening*, *supra*, 2 Cal.5th at p. 311.) Where a defendant engages in "a course of conduct encompassing several acts pursued with a single objective," "we then consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives." (*Ibid*.) "A 'course of conduct' may be considered a single act within the meaning of section 654 and therefore be punishable only once, or it may constitute a 'divisible transaction' which may be punished under more than one statute." (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252.) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, disapproved on another ground in *Correa*, *supra*, 54 Cal.4th at pp. 334, 344.)

**B.      *Analysis***

The trial court stayed the sentence on the burglary conviction (count II) pursuant to section 654 but declined to stay the sentence on the domestic violence conviction (count V). The court explained its reasoning as follows: "With respect to Count [V], [the court] think[s] that's a distinct—it's not part of the same—under [section] 654 same transaction, so [the court is] going to order that for Count [V, the court] will impose one-third the midterm. That will not be concurrent."

Defendant argues the kidnapping, burglary and domestic violence offenses were part of an indivisible continuous course of conduct with the sole objective of taking physical custody of J.C. He further contends the crimes of kidnapping and domestic violence "occurred simultaneously, with the objective of removing the child from mother's grasp to take custody" and the matter should be remanded for the trial court to stay the consecutive sentence imposed on count V for domestic violence. The People

respond that although the court wrongly found that the domestic violence offense was not part of the same transaction of the kidnapping under section 654, its decision not to stay defendant's sentence was proper because defendant's crimes fall within the multiple victim exception. Specifically, the People argue the multiple victim exception to section 654 applies because the domestic violence crime was committed against Kimberly and the kidnapping was committed against a different victim, J.C.

"If the defendant is convicted of multiple crimes incidental to a single criminal intent and objective, the trial court may avoid prohibited multiple punishment [under section 654] by staying execution of sentence on all but one of the convictions." (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781.) However, "section 654 does not apply to crimes of violence against multiple victims." (*Correa*, *supra*, 54 Cal.4th at p. 341; see *People v. Oates* (2004) 32 Cal.4th 1048, 1063, superseded by statute on another ground as stated in *People v. Tirado* (2022) 12 Cal.5th 688, 695–696.) "Under this exception, 'even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim.' [Citations.] The reason for the multiple victim exception is that 'when a defendant " 'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons,' his greater culpability precludes application of section 654." ' " (*Garcia*, at p. 1781.) "To preclude application of section 654, … each of the crimes must have involved at least one different victim." (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 230.)

Even if we accept defendant's contention that his offenses were part of an indivisible course of conduct with the sole objective of taking J.C., defendant may be separately punished for each crime of violence committed against different victims under

the multiple victim exception to section 654.[17] Because defendant's kidnapping and domestic violence offenses were committed against different victims, the multiple victim exception applies, and the trial court did not err in imposing a consecutive sentence on count V.

Simple kidnapping under section 207 requires the use of force or fear and is a violent crime for purposes of the multiple victim exception. (*People v. Centers* (1999) 73 Cal.App.4th 84, 100.) As previously discussed, kidnapping is a crime against the person taken. (*In re Michele D.*, *supra*, 29 Cal.4th at p. 614.) J.C. was thus defendant's victim for the kidnapping.

Defendant's domestic violence offense is a self-described crime of violence. (See *People v. Cardenas*, *supra*, 239 Cal.App.4th at pp. 232–233 [courts may look to the statutory definition of a crime to determine if it is a crime of violence for purposes of § 654].) Section 273.5 prohibits willful infliction of "corporal injury resulting in a traumatic condition" upon someone with whom the offender has or had a dating relationship, or upon the mother or father of the offender's child. (§ 273.5, subds. (a), (b)(3), (4).) A " 'traumatic condition' means a condition of the body, such as a wound, or external or internal injury, including, but not limited to, injury as a result of strangulation or suffocation, whether of a minor or serious nature, caused by a physical force." (§ 273.5, subd. (d).) Kimberly sustained bruises on both arms from defendant and Dominic forcing her arms open to get J.C. while she was in her car in the garage. The bruises lasted about a week or two. She also had scrapes on her feet from being pulled out of the black sedan by defendant.[18] Although the domestic violence offense

---

[17] Defendant's reliance on *People v. Mitchell* (2016) 4 Cal.App.5th 349 is misplaced because there was only one victim in that case.

[18] Kimberly also reported pain in her head, but that was presumably related to the female punching Kimberly's head, not from defendant's abuse.

23.

was committed to facilitate the kidnapping, defendant committed this offense against Kimberly, a different victim from his kidnapping offense.

Defendant's kidnapping and domestic violence offenses were both crimes of violence committed against different victims. Therefore, the trial court properly imposed consecutive sentences for these offenses.

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

DETJEN, J.

FRANSON, J.

24.